## IN THE MATTER OF JAMES DEL MAURO.

Argued December 22, 1970—Decided January 25, 1971.

*Mr. Thomas C. Brown,* Assistant Prosecutor of Essex County, for the order.

*Mr. Justin P. Walder* argued the cause for respondent (*Mr. Jeffrey Barton Cahn,* on the brief; *Messrs. Schapira, Steiner and Walder,* attorneys).

PER CURIAM. This is an ethics matter. Respondent, formerly Chief Judge of the Municipal Court of Newark, was charged with accepting fees or gratuities with respect to the performance of marriage ceremonies, contrary to the Canons of Judicial and Professional Ethics and the directive of our Court contained in Municipal Court Bulletin Letter No. 115 dated October 7, 1965. On December 3, 1969 the charge was referred for trial before a judge of the Superior Court as a master. Respondent resigned as judge

on December 8, 1969. After extensive hearings, the master filed a presentment and thereupon we issued an order directing respondent to show cause why he should not be disbarred or otherwise disciplined.

Some background material should be noted. By *N. J. S. A.* 37:1–13 judges of the municipal courts are empowered to solemnize marriages. *N. J. S. A.* 2A:8–9 provides that these judges "shall be compensated by an annual salary" and that the "compensation so paid to magistrates shall be in lieu of any and all fees." Another statute, *N. J. S. A.* 2A:105–1, provides that any judge "who, by color of his office, receives or takes any fee or reward not allowed by law for performing his duties, is guilty of a misdemeanor." In 1965 we received word that some magistrates were accepting fees or gratuities for performing wedding ceremonies. We asked our Municipal Court Committee to ascertain by selective but confidential questionnaire whether that practice existed, and if so, the sums involved. The inquiry was conducted and the report indicated the practice was widespread but the total sums involved were quite low.

Having no doubt whatever of the impropriety of that practice, we directed the Administrative Director of the Courts to advise all judges accordingly and hence there was dispatched to all municipal court judges Municipal Court Bulletin Letter No. 115 dated October 7, 1965, which contained the following:

"The Supreme Court has requested me to advise all Magistrates and Judges that it considered it to be highly improper for them to accept a fee or gratuity for performing a marriage ceremony. The Supreme Court also is of the view that Court Clerks and other Court employees may not accept a fee or gratuity in connection therewith."

A committee of municipal court judges, consisting of the chairman of each county association of magistrates, asked to meet with the Chief Justice, and a meeting was held on October 22, 1965. A further meeting was held on February 15, 1966 by the committee and the entire Supreme Court. At

both meetings the municipal court judges sought a reversal of the view stated in the bulletin letter of October 7, 1965, but their request was refused, and indeed they were informed that there existed a disturbing possibility that the acceptance of a fee or gratuity might violate the criminal statute cited above.

In 1965 the Legislature sought to amend *N. J. S. A.* 2A:8–9, the compensation statute mentioned above, to add "but nothing herein shall limit the right of any magistrate to accept fees or gratuities in connection with his services in solemnizing marriages." Governor Hughes, however, vetoed that bill on June 3, 1968, saying in part:

"* * * Inasmuch as this measure would give official sanction to a practice which is of questionable propriety and which is contrary to the announced policy of the Supreme Court of New Jersey, I must withhold my approval therefrom."

The Governor quoted Bulletin Letter No. 115 and noted that the Supreme Court reaffirmed its position in a memorandum to the chairmen of the Magistrates' Association in November 1965 (after the meeting with the Chief Justice mentioned above). We add that the content of Bulletin Letter No. 115 was repeated in Bulletin Letter No. 148, dated June 27, 1968, also sent to all judges of the municipal courts.

With this background, we return to the present proceeding. Respondent became a judge of the Municipal Court on December 7, 1964, about ten months prior to Bulletin Letter No. 115. It is clear that respondent's predecessor as Chief Judge of that court had established a charge of $20 per marriage. Respondent says that his staff simply continued the practice until October 1969 when he says he first learned of the ban contained in Bulletin Letter No. 115 at the annual meeting of the municipal court judges held that month. Respondent said he had been too busy to read bulletin letters. The master found respondent's disclaimer of knowledge to be incredible. We agree. It is incomprehen-

sible that any municipal court judge in this State was unaware of our decision stated in that bulletin letter. We have no doubt whatever that respondent knew of the ban and continued his practice in the face of it.

We do not know how much money was involved. Respondent says he maintained no record of the fees he received. He reported $700 for "wedding fees" in his federal tax return for 1965; $500 for 1966; $700 for 1967; and $750 for 1968. The evidence shows that respondent performed 2,070 marriages between October 7, 1965 and December 8, 1969, the date of his resignation. The investigation of course could not cover 2,070 marriages. Seventy-four witnesses testified with respect to four marriages in 1965 before Bulletin Letter No. 115; 16 in 1965 after that letter; seven in 1966; nine in 1967; 24 in 1968; and 14 in 1969. Only one testified that no money was paid; five could not recall the amount; 68 said they paid $10 to $30. There were introduced into evidence 23 statements or reports covering marriages as to which no money was paid or the person interviewed could not recall whether money was paid. The testimony makes it evident that a charge was uniformly sought, either bluntly or by adequate suggestion, and although we accept respondent's testimony that no charge was made of persons who could not pay, the violation of our directive was nonetheless flagrant and extensive.

Much argument was devoted to whether Bulletin Letter No. 115 was a "directive" as we described it in our order referring the charge to the master for trial. We do not understand the preoccupation with that question. Respondent was not cited for contempt for violating an "order." He was charged with unethical conduct, and indeed with conduct we had expressly found to be "highly improper." Behavior in a judge or lawyer is no less unethical because the proscription of that behavior is not followed by an express order not to behave unethically. Judicial ethics and professional ethics reflect the uncompromising demands of the offices involved. The Canons attempt to spell out the guid-

ing principles insofar as improprieties may be anticipated. Case law may expand or add to the Canons. *In re Mattera,* 34 *N. J.* 259, 263-4 (1961). So, too, may individual rules of court, or, as here, an administrative pronouncement. The compulsion to comply inheres in the office of the judge and in the office of the member of the bar. That obligation need not, as a predicate for professional discipline, be activated by an express command not to do what may not be done.

In the light of these conclusions, we need not consider the question discussed by the master, whether respondent's conduct could be said to violate *N. J. S. A.* 2A:105-1, referred to above.

The remaining question is the amount of discipline. As we have said, we find respondent was baldly indifferent to what he knew was our view of judicial propriety, and we add, lest our silence be thought an oversight, that his disclosures in his income tax returns do not, under the total circumstances, point the other way. It is true that respondent has already experienced the pain of resignation from judicial office in the face of charges. And it is argued that this being the first case of its kind in which discipline is being imposed, the discipline should be moderated on that account. See *In re Kamp,* 40 *N. J.* 588, 599-600 (1963); *In re Pagliughi,* 39 *N. J.* 517, 526 (1963). There is some limited force in that position. We conclude that, here, the appropriate disposition is a suspension for one year from the practice of the law, and until the further order of the Court.

*For suspension for one year*—Chief Justice Weintraub and Justices Jacobs, Francis, Proctor, Hall, Schettino and Haneman—7.