IN THE MATTER OF LOUIS J. MATTERA, ATTORNEY-AT-LAW OF NEW JERSEY AND MAGISTRATE OF THE MUNICIPAL COURT OF THE CITY OF WILDWOOD.

Argued November 9, 1960—Decided February 20, 1961.

For the order: *Mr. Morris M. Schnitzer.*

For the respondent: *Mr. David L. Horuvitz.*

The opinion of the court was delivered by

WEINTRAUB, C. J. Respondent is a member of the bar and magistrate of the Municipal Court of the City of Wildwood. On the basis of charges arising out of his conduct as magistrate, we issued an order to show cause why he should not be adjudged in contempt of the Supreme Court and be disbarred or otherwise disciplined.

A routine examination by the Administrative Director of the Courts of the records of the municipal court revealed apparent irregularities in the handling of traffic tickets. Being so informed, we ordered an investigation before the Honorable Anthony J. Cafiero, a judge of the Superior Court. Upon receipt of his report, we assigned the Honorable John B. Wick, also a judge of the Superior Court, to be acting magistrate of the municipal court. In that capacity Judge Wick cited the mayor and also a commissioner of the City of Wildwood for contempt of the municipal court. We also referred to Judge Wick for hearing and report the order to show cause against the respondent described in the paragraph above.

Upon the consent of all parties, a single hearing was held. Judge Wick found the mayor and the commissioner guilty of contempt and imposed fines. Neither has appealed.

He also reported his findings with respect to the respondent magistrate, and that report is now before us.

All of the traffic tickets involved non-moving violations. The tickets, some 200 in number, were delivered either by the mayor or by the commissioner to the clerk of the municipal court. In their testimony the mayor and the commissioner disavowed a purpose to "kill" the charges, saying they merely wanted the magistrate to direct the police to investigate grievances claimed by the individuals who had been summoned. Judge Wick understandably found their purpose was to obstruct the processes of the municipal court and adjudged them guilty of contempt. The magistrate testified that upon being advised by the clerk of the actions of the mayor and the commissioner, he ordered the clerk nonetheless to process the tickets, that is, to obtain from the licensing authorities the identities of the owners of the vehicles and then to bring the traffic charges on for trial by further notice. The clerk testified in harmony with the magistrate's version and added that letters to the issuing authorities were in fact prepared but were not mailed by him because he had embezzled receipts and the follow-up procedure would have exposed his offense. Upon his confession, criminal charges were brought against the clerk and he was later convicted and sentenced. The foregoing gives the general setting.

The charges against the magistrate stem from alleged infractions of the rules of practice and procedure and rules for the internal administration of the judicial system, as well as the *Canons of Judicial Ethics*, all adopted by this court.

Several decisions within the past few years have involved charges against magistrates. *In re Palmisano*, 18 *N. J.* 497 (1955); *In re Klaisz*, 19 *N. J.* 145 (1955); *In re Stevens*, 20 *N. J.* 177 (1955). In the first two cases, the conduct violated a rule of court prohibiting a magistrate from acting as an attorney in the affairs of the municipality in which he holds court. The activities thus did not relate to conduct

as magistrate but rather to conduct as an attorney which assumed an unwholesome cast because the attorney held the office of magistrate. In the last cited case, the charges related directly to conduct in the judicial office. The thesis pursued was that a violation of the rules governing the municipal court and the *Canons of Judicial Ethics* constituted a contempt of this court.

When we issued the order to show cause, we were conscious of important questions as to our power. Aware also of the regrettable tendency of accuseds to appear with hat in hand before a tribunal which judges its own complaint, we invited counsel for respondent to question our power with absolute candor. We made the same request of counsel we designated to prosecute the charges. Both responded with gratifying frankness and industry.

I.

The beginning point is the broad question whether the Court's disciplinary power and responsibility are limited to misconduct committed by an attorney in his strictly professional capacity.

The *Constitution* (*Art.* VI, § II, *par.* 3) provides:

"The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted."

Pursuant to this authority, a rule of court (*R. R.* 1:25) was adopted, reading:

"The Canons of Professional Ethics, and the Canons of Judicial Ethics, adopted by the American Bar Association, as amended and supplemented by this court, * * * shall govern the conduct of the judges and the members of the bar of this State."

These canons do not exhaust the demands of ethics. As the preamble to the *Canons of Professional Ethics* observes,

"No code or set of rules can be framed, which will particularize all the duties of the lawyer in the varying phases of litigation or in all the relations of professional life" and accordingly "the enumeration of particular duties should not be construed as a denial of the existence of others equally imperative, though not specifically mentioned." The canons were adopted to guide and forewarn to the extent to which prior experience permitted that fair and salutary course.

Hence the disciplinary power is not confined to the area covered by the canons. It has long been settled here and elsewhere that any misbehavior, private or professional, which reveals lack of the character and integrity essential for the attorney's franchise constitutes a basis for discipline. *In re Wagner,* 27 *N. J.* 217 (1958); *In re Carlsen,* 17 *N. J.* 338 (1955); *In re Howell,* 10 *N. J.* 139 (1952); *In re Isserman,* 6 *N. J. Misc.* 146, 140 *A.* 253 (*Sup. Ct.* 1928); *In re Young,* 75 *N. J. L.* 83, 96 (*Sup. Ct.* 1907); Annotations, 9 *A. L. R.* 189 (1920); 43 *A. L. R.* 107 (1926); 55 *A. L. R.* 1373 (1928).

The reason for this rule is not a desire to supervise the private lives of attorneys but rather that the character of a man is single and hence misconduct revealing a deficiency is not less compelling because the attorney was not wearing his professional mantle at the time. Private misconduct and professional misconduct differ only in the intensity with which they reflect upon fitness at the bar. This is not to say that a court should view in some prissy way the personal affairs of its officers, but rather that if misbehavior persuades a man of normal sensibilities that the attorney lacks capacity to discharge his professional duties with honor and integrity, the public must be protected from him.

In terms of rational connection with fitness at the bar, behavior of an attorney in judicial office cannot be insulated from the demands of professional ethics. On the contrary, the judge's role is so intimate a part of the process of justice that misbehavior as a judge must inevitably reflect upon qualification for membership at the bar. Hence the

disciplinary power should apply unless it is restrained by some provision of the Constitution. We proceed to the question whether an exception can there be found.

## II.

The Constitution nowhere expressly excludes misbehavior of an attorney in judicial office from the Court's disciplinary power. The question is whether such an exception is revealed by implication.

We note at once that the weight of authority elsewhere sustains the court's power to discipline an attorney because of misconduct in judicial office. The cases are collected in 53 *A. L. R. 2d* 305 (1957) and to them may be added later decisions in support, *State ex rel. Nebraska State Bar Assn. v. Conover,* 166 *Neb.* 132, 88 *N. W. 2d* 135 (*Sup. Ct.* 1958); *Mahoning County Bar Assn. v. Franko,* 168 *Ohio St.* 17, 151 *N. E. 2d* 17 (*Sup. Ct.* 1958), *certiorari* denied 358 *U. S.* 932, 79 *S. Ct.* 312, 3 *L. Ed. 2d* 305 (1959), and one decision to the contrary, *Petition of Colorado Bar Assn.,* 137 *Colo.* 357, 325 *P. 2d* 932 (*Sup. Ct.* 1958). We think the majority view has the better of the argument.

The arguable bases for an implied exception to the disciplinary power are (a) that the constitutional remedy of impeachment by inference excludes any other public remedy for the same misbehavior; (b) that since the Constitution expressly deals with the manner in which a judge may be removed, the power to disbar is impliedly denied because disbarment will lead to loss of the judicial office; and (c) the power to discipline is incompatible with the independence a judge must have for the fearless discharge of his official duties.

The total argument against our power postulates several subsidiary propositions which, although analytically involved, yet are of such significance that we ought to leave their validity to litigation in which attention would be more acutely focused upon them. Where we are of that view, we

will so note and merely assume the truth of the proposition for the purposes of the present case.

The first proposition thus incidentally involved is that a magistrate is subject to impeachment. If he is not, so much of the argument against our authority as rests upon the impeachment provision would be irrelevant. The Constitution provides expressly for the impeachment of members of the courts it creates. *Art.* VI, § VI, *par.* 4. The municipal court, however, is one of the inferior courts which the Legislature may from time to time establish, alter or abolish (*Art.* VI, § I, *par.* 1). Hence the magistrate is not a judicial officer within the impeachment provision just cited, but if he is a "State" officer, he is subject to impeachment under another provision, *Art.* VII, § III, *par.* 1.

The municipal court is an integral part of the statewide judicial system and exercises a power retained by the State and not delegated to local government. *Kagan v. Caroselli,* 30 *N. J.* 371, 377, (1959). In *Krieger v. Jersey City,* 27 *N. J.* 535, 544 (1958), we found it unnecessary to decide whether the office of magistrate is a municipal one. For the reasons stated above, we feel we should reserve the question whether a magistrate is a state officer subject to impeachment. For present purposes we will assume that he is.

A.

The first question is whether the remedy of impeachment excludes other remedies which the misbehavior would otherwise require to be exerted for the public good. This question is easily answered.

A single act of misconduct may offend the public interest in a number of areas and call for an appropriate remedy as to each hurt. Thus it may require removal from public office. It may also require criminal prosecution. Still further it may require that the roster of attorneys be cleansed of a miscreant. The remedies are not cumulative to vindicate a single interest; rather each is designed to deal with

a separate need. We can think of no reason why a prescription in the Constitution of a remedy for one purpose should be found to bespeak an intention to deny government the power to protect the public in its other interests or to immunize the offender from the further consequences his act would otherwise entail. *Cf. Reilly v. Ozzard,* 33 *N. J.* 529, 539 (1960).

██ This conclusion is supported by *State v. Jefferson,* 90 *N. J. L.* 507 (*E. & A.* 1917). The *Constitution of* 1844 provided (*Art.* VI, § III, *par.* 3) as does the present one (*Art.* VII, § III, *par.* 3) that "the person convicted [on impeachment] shall nevertheless be liable to indictment * * *." Jefferson, a prosecutor of the pleas, was convicted of crime in office. He contended the Constitution required a conviction on impeachment as a condition precedent for a criminal prosecution. The court pointed out that whereas anciently criminal punishment could be imposed in the impeachment proceeding, a conviction on impeachment under our Constitution affects only the right to hold office. Hence the phrase we have quoted was included to prevent a plea that conviction on impeachment constituted a bar to a criminal prosecution rather than to condition or postpone the criminal remedy (at *p.* 509). That case thus serves to demonstrate that the remedy of impeachment has the single role we have stated and was not intended to bar or delay another remedy for a public wrong. We add that although membership at the bar was a statutory requirement for the office of prosecutor of the pleas, 1 *Comp. Stat.* (1910), § 5, *p.* 153, *N. J. S. A.* 2*A*:158–1, disbarment proceedings were instituted against Jefferson before he resigned from his public office. Another prosecutor of the pleas was disbarred after conviction for official crime. *State v. Bolitho,* 103 *N. J. L.* 246 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 446 (*E. & A.* 1927). In his case the official records indicate he resigned from office before the court's disciplinary process was invoked.

### B.

The next question is whether the disciplinary power is curtailed on the thesis that since the Constitution provides for removal from office, it impliedly prohibits any other proceeding which would incidentally lead to the same result. The thesis invoked is akin to the one discussed in "A" above with a further refinement.

 Several premises are involved. The first is that the Court is not empowered to remove a judge by a proceeding directed to that end. Reflecting the widely-held view that the impeachment process is too cumbersome to be meaningful, Seufert, *Problems of Judicial Selection*, 2 *Constitutional Convention of* 1947, *p.* 1631, 1644; Miller, "Discipline of Judges," 50 *Mich. L. Rev.* 737 (1952); *State v. Jefferson, supra* (90 *N. J. L.*, at *pp.* 508–509), the impeachment provision itself (*Art.* VI, § VI, *par.* 4) further directs that "The Judges of the Superior Court and the Judges of the County Courts shall also be subject to removal from office by the Supreme Court for such causes and in such manner as shall be provided by law." The Legislature, however, has yet to implement this mandate upon it. Nor has any statute been enacted to deal in a comprehensive way with the subject of removal of judges of the inferior courts. Hence as matters now stand, we must accept the premise that the Supreme Court is not authorized to remove a judge from office by a proceeding directed to that end.

The second premise is that disbarment will lead to loss of judicial office. The Constitution (*Art.* VI, § VI, *par.* 2) requires that judges of a constitutional court "shall each prior to his appointment have been admitted to the practice of the law in this State for at least ten years." The Constitution does not prescribe the qualifications for judges of the inferior courts. As to the municipal court, the Legislature has provided (*N. J. S.* 2A :8–7) that every magistrate "shall be a * * * attorney at law, of this state, or a person holding on January 1, 1952 the office of municipal

court magistrate * * *." Respondent came into office after January 1, 1952, and hence as to him membership at the bar is prerequisite. The argument postulates that membership at the bar, thus made prerequisite for appointment, is a continuing qualification for incumbency in office. See 42 *Am. Jur., Public Officers,* § 41, *p.* 912. We will accept the validity of this premise without deciding it.

Parenthetically we note that this requirement as to a magistrate is statutory only, and hence the total argument we are now considering involves analytically the subsidiary issue whether the Court's constitutional power with respect to the practice of law can be restrained by legislation. For present purposes we will not pursue that further inquiry.

The question then is whether from all of the foregoing, it should be inferred that the disciplinary power may not be invoked because the judicial office would be lost as a consequence of disbarment. It should be noted at once that if the proposition were sound, the disciplinary power would be equally foreclosed if the misconduct were committed in activities wholly extraneous to judicial office. Thus an attorney who is a part-time judge could not be disciplined even for gross misbehavior as an attorney, and a part-time or full-time judge would be immune no matter how bald a lack of integrity his extra-judicial misconduct may reveal. We point to the reach of the proposition since its sweep cannot be ignored when the issue is whether the grant of the disciplinary power, unlimited in its terms, should be found to be curtailed by implication.

The answer is that if membership at the bar is required for continuance in judicial office, the requirement is completely consistent with the exercise of the disciplinary power. Far from denying that power, the prescription would confirm it, for in demanding that the incumbent continue to measure up to the high standards of the profession, reliance is necessarily placed upon the continued exercise of the disciplinary power by the agency vested with it. Hence if judicial office should be lost in the wake of disbarment, that consequence

would be precisely what the Constitution contemplated. See *Mahoning County Bar Assn. v. Franko, supra* (151 *N. E. 2d,* at *p.* 22); *In re Stolen,* 193 *Wis.* 602, 214 *N. W.* 379, 383, 216 *N. W.* 127, 55 *A. L. R.* 1355 (*Sup. Ct.* 1927).

## C.

The final phase of the issue is whether the disciplinary power so menaces independence in judicial office as to require inferentially an exception to that power. In this connection we note a broad expression by the Court of Errors and Appeals that "From the earliest times, judicial officers in England and America have been free from prosecution for their official acts except in the legislative forum" and "The reason is because it was early recognized that a judicial officer must be free to form his own judgments." *In re New Jersey State Bar Assn.,* 114 *N. J. Eq.* 261, 265 (*E. & A.* 1933). No doubt a judge may not be charged criminally because his exercise of judgment was erroneous. The reason is that whenever action depends upon the exercise of discretion or judgment, be the office judicial or non-judicial, mere error therein cannot be called wrongful in a criminal sense. But where actual fraud or corruption exists, a judicial officer is subject to indictment with respect to official misconduct. See 30A *Am. Jur., Judges,* §§ 86–88, *pp.* 55–56. Upon that premise, the Legislature adopted criminal statutes affecting judges. *N. J. S.* 2A:93–1 and 5; 2A:105–1 and 2; 2A:99–2. The criminal process being compatible with judicial independence, we cannot see how the disciplinary process is any less so.

This objection does not rationally go to the existence of the disciplinary power but rather to the formulation of a proper basis for its exercise. It would indeed be intolerable to discipline because of mere error in judicial or professional activities. The disciplinary power is ordinarily exerted only when conduct is marked with moral turpitude and thus reveals a shortage in integrity and character. So under-

stood, the disciplinary power cannot deter a judge from fearless and independent judgment.

## III.

The remaining question with respect to power is whether disobedience of the promulgated rules may constitute a contempt of this court. As we have already said, *In re Stevens, supra* (20 *N. J.* 177) accepted the proposition that it may.

Thoughtful students of the judicial process reject the notion that every judge is sovereign within an allotted domain, accountable with respect to the manner of his performance only to the appointing authority when the question of renewal of incumbency should arise. The judicial branch must function as an integrated whole under responsible supervision. Our present Constitution embraces this philosophy.

Accordingly, as already noted, *Article* VI, § II, *par.* 3 vested in the Supreme Court authority, subject to law, to make rules governing the practice and procedure in all courts, and also to "make rules governing the administration of all courts in the State." We have already mentioned the mandate for legislation to fix the basis for removal by the Supreme Court of judges of the Superior and County Courts. *Art.* VI, § VI, *par.* 4. The Constitution provides also that whenever the Supreme Court shall certify that it appears that a judge of any of the constitutional courts is so incapacitated as substantially to prevent him from performing his judicial duties, the Governor may retire such judge upon the recommendation of a commission appointed by him. *Art.* VI, § VI, *par.* 5. Further, the Chief Justice is constituted "the administrative head of all the courts in the State," *Art.* VI, § VII, *par.* 1, and is authorized to "assign Judges of the Superior Court to the Divisions and Parts of the Superior Court" and from time to time to "transfer Judges from one assignment to another, as need appears." *Art.* VI, § VII, *par.* 2.

■ Thus this court is charged with responsibility for the overall performance of the judicial branch. Responsibility for a result implies power reasonably necessary to achieve it. More specifically, the power to make rules imports the power to enforce them. The question therefore is not whether compliance may be compelled, for surely it may, but rather what sanctions are reasonably necessary to that end.

The summary contempt power is indeed awesome. Its nature is harsh, for despite such antidotes as may be invented, the court is at once the complainant, prosecutor, judge and executioner. It is a power which can be justified by necessity alone.

The rules cover so many subjects that it would be unwise to speak in terms applicable to each and every one of them. In determining what remedy is appropriate, the nature and purpose of the particular rule would be significant. Thus a violation of the rules of civil practice and procedure would not ordinarily justify the exercise of the contempt power. If other sanctions are sufficient they should be exclusive. But with respect to rules of internal administration and the *Canons of Judicial Ethics,* the contempt process may be the sole feasible remedy, especially in the case of a magistrate who is not an attorney and hence is beyond the disciplinary jurisdiction over members of the bar. It may be that where a rule prescribes a specific affirmative duty of office, the common law crimes of nonfeasance, misfeasance or malfeasance could be charged, assuming of course the presence of all their required ingredients. But even there, there is another side to the coin: a prosecution for crime may be too heavy a hand to lay upon the offender. Despite its autocratic capacity, the contempt process more easily permits a tempering of consequences when the misconduct should be equated with a petty offense as that term is understood in the legal art. Moreover, whether the conduct

does or does not amount to the common law crime, there may be an overriding necessity to stop at once a course of behavior which contaminates the judicial process.

The summary contempt power, as defined by *N. J. S.* 2*A*:10–1, extends to "Disobedience \* \* \* by \* \* \* any person whatsoever to any lawful \* \* \* order, or command of the court." There can be no doubt that a judge of an inferior court may be attached for disobedience of a direct order of a superior court. *State v. Hunt,* 1 *N. J. L.* 287, (*Sup. Ct.* 1795). *Blackstone* (*Book* IV, *p.* 284) states the principal instances usually punished by attachment included:

"1. Those committed by inferior judges and magistrates; by acting unjustly, oppressively or irregularly, in administering those portions of justice which are intrusted to their distribution: or by disobeying the king's writs issuing out of the superior courts, by proceeding in a cause after it is put a stop to or removed by writ of prohibition, *certiorari,* error, *supersedeas* (a command to stay or forbear doing that which ought not to be done), and the like. For, as the king's superior courts, and especially the court of king's bench, have a general superintendence over all inferior jurisdictions, any corrupt or iniquitous practices of subordinate judges are contempts of that superintending authority whose duty it is to keep them within the bounds of justice."

See also 1 *Bailey, Habeas Corpus* (1913), *p.* 387.

A rule adopted pursuant to the Court's duty to administer and supervise, directing specific action by a magistrate, should fairly be deemed to be an order within the statute quoted above. A more technical approach would require an intermediate proceeding to order a judge to do what the general rule already commands. It should not be necessary thus to repeat a direction to a member of the judiciary. The only conceivable reason for the additional step would be the possibility that a rule was misunderstood or overlooked. As to this, ample protection lies in the basic proposition that a mere violation would not sustain a charge. The infraction must be knowing and willful and evidence an intent to flout the authority of the Court. It is only

in those terms that the contempt power applies, subject as always to the *caveat* that the power is most respected and tolerable when it is used the least.

## IV.

This brings us to the merits of the case.

 In view of our ultimate conclusion that the order to show cause should be discharged, little would be gained by detailed discussion of the evidence.

Most of the charges relate to respondent's failure to comply with the rules relating to the maintenance of records, reporting, and the procedure to be followed in the disposition of causes. That respondent failed to comply in some respects is clear enough, but we cannot find a basis for discipline. The failure was due in part to misunderstanding. In part it was due to deficiencies in facilities and supporting personnel, accentuated by the circumstance that the City of Wildwood is a resort community and as such experiences a tremendous rise in judicial business during the summer months. In part the failure is chargeable to respondent, but we are not persuaded that it was attended by improper motivation.

The remaining charge relates to the "killing" of the tickets described at the outset of this opinion. The evidence is equivocal with respect to respondent's complicity. As we have already said, respondent insists he directed the clerk to process the charges notwithstanding the efforts of the mayor and the commissioner. The clerk also so testified. The time hiatus between the dates of the summons and the dates of the letters to the licensing authorities was undue, despite the volume of work, and tends to lend substance to the charge. But the lack of sufficient personnel and the clerk's efforts to conceal his embezzlement may well account for the sluggish approach to the disposition of the tickets.

But respondent did fail to deal decisively with the interference by the mayor and the commissioner with the processes

of his court. It was not enough merely to direct the clerk to ignore their efforts. *R. R.* 8:10–2 expressly provides:

"Any person who aids in the disposition of a traffic ticket or summons in any manner other than that authorized by the court shall be proceeded against for criminal contempt in the manner provided by Rule 8:8–2."

There undoubtedly is some discretion with respect to the institution of a contempt proceeding under the rule. In an isolated case the magistrate may feel a sharp warning to the intruder will suffice. But here the interference was wholesale, and respondent did nothing to stop it or to punish the offenders. Rather, on his own testimony, he merely directed the clerk to overcome an accomplished interference by resort to supplementary process. The explanation is not hard to find. Respondent was appointed by local officials and was reluctant to cross them. He was weak when he should have been strong. The rule quoted above was adopted with an awareness of the unhealthy possibilities inherent in the existing structure of the municipal courts. It was adopted to alert the magistrate to his high obligation to guard the judicial process from pollution and to equip him to deal quickly and firmly with a transgressor.

In many respects the municipal court is the most important in our judicial system. No other court can match its volume of causes. Our municipal courts dispose annually of approximately one and one-half million matters, a number which dwarfs the total proceedings in all other courts of the State. For all practical purposes, the judgments of the municipal court are final. It is there that most citizens have their sole exposure to the judicial process. The respect they have for the judiciary hinges upon that experience. Thus the magistrate has a unique responsibility for the popular image of the entire system.

Justice is the right of all men and the private property of none. The judge holds this common right in trust, to administer it with an even hand in accordance with law. A

judge who does "favors" with his office is morally an embezzler. He is also a fool, for a judge who plays a "good" fellow for even a few must inevitably be stained with the reputation of a man who can be reached.

Respondent failed to react to interference with his court with the decisiveness demanded by his judicial responsibility as well as by his own personal interest. But since we are satisfied he had no improper motive, the charge against him is not sustained.

The order to show cause is accordingly discharged.

*For discharging rule*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

Opposed—None.