In re Petition for DISCIPLINARY AC-
TION AGAINST Emanuel A. SER-
STOCK, an Attorney at Law of the
State of Minnesota.

No. CX–87–1101.

Supreme Court of Minnesota.

Dec. 2, 1988.

William J. Wernz, Director of Lawyers
Professional Responsibility Bd., St. Paul,
for appellant.

David G. Rosten, Minneapolis, for re-
spondent.

PER CURIAM.

Respondent is the subject of disciplinary
proceedings brought by the Lawyers Pro-
fessional Responsibility Board which al-
leged income tax violations and misconduct
for improperly dismissing or delaying dis-
position of traffic tickets while serving as

Chief Deputy City Attorney of Minneapolis. A court-appointed referee issued findings of fact, conclusions of law and recommendations which included an indefinite suspension from the practice of law without right to petition for reinstatement for at least 2 years. We adopt the referee's findings and recommendations.

The respondent, Emanuel A. Serstock, was admitted to practice law in Minnesota on October 13, 1961. From 1974 to October 7, 1985, respondent served as Chief Deputy City Attorney for the Criminal Division of the Minneapolis City Attorney's Office. While serving in this capacity, respondent dismissed or delayed disposition of traffic tickets brought to him by individuals to whom he was indebted. On October 29, 1985, respondent was indicted by the Hennepin County Grand Jury on three counts of public misconduct under Minn. Stat. § 609.43(2) (1984) in connection with his conduct as deputy city attorney. This court later dismissed the indictment against respondent, but expressly stated that respondent was still subject to disciplinary action by the Lawyers Professional Responsibility Board. *State v. Serstock*, 402 N.W.2d 514, 520 n. 6 (Minn.1987).

On March 8–9, 1988, a hearing was held on the director's June 5, 1987 petition for discipline and a December 23, 1987 supplementary petition. The court-appointed referee issued his findings of fact and conclusions of law on March 25, 1988, and recommended that respondent be indefinitely suspended from the practice of law for a period not less than 2 years.

Respondent ordered a transcript pursuant to R.Law.Prof.Resp. 14(e) on March 31, 1988; therefore, the referee's findings of fact and conclusions of law are not conclusive. Respondent, however, does not dispute any of the referee's findings of fact or conclusions of law. On appeal, respondent's only contention is that the recommended 2–year suspension is too severe because the referee did not give enough weight to mitigating factors.

The director's petitions allege and the referee's findings establish five separate bases for discipline:

*Count I—Conflict of Interest Between Public Duty and Personal Interest*

The conflict-of-interest allegations against respondent stem from his dealings with the following three creditors while he was deputy city attorney for the City of Minneapolis. In this position, respondent had complete charge of prosecuting all offenses referred to the city attorney.

### 1. *Erwin Dauphin*

In 1981, Erwin Dauphin, a former office manager at the Minneapolis City Attorney's Office, provided respondent with $1,000. While respondent characterized the money as a loan, he did not give or sign a promissory note evidencing the debt and did not discuss repayment. In the summer of 1982, respondent received an additional $250 from Dauphin. Respondent did not pay back any of the money he borrowed from Dauphin and, shortly after the first loan, Dauphin began bringing respondent traffic tickets issued to him and his friends with the understanding that respondent would "erase" them. Respondent dismissed or delayed disposition of nearly all the tickets brought to him by Dauphin.

### 2. *Stephan Wallack*

In the summer of 1982, Dauphin introduced respondent to Stephan Wallack, president of Magnum Tire Corporation. Shortly after Wallack met respondent, he was asked by Dauphin to provide respondent with $150. In late 1983 or 1984, Wallack loaned respondent an additional $500. No loan documents were ever drafted for either transfer. Respondent paid back the $500 loan over a 10–month period, but did not pay back the first loan. On several other occasions, Wallack provided respondent with free North Star tickets and discounted automobile tires.

After the first loan to respondent and until 1985, Wallack brought respondent traffic tickets issued to his family and employees with the understanding that they would be taken care of. Respondent dismissed or delayed disposition of nearly all

the other tickets brought to him by Wallack.

Wallack admitted in his testimony to the Hennepin County Grand Jury that he felt he received special treatment in regard to the traffic tickets because of his relationship with respondent. Conversely, respondent testified at his disciplinary hearing that he would have handled the tickets brought to him by Wallack in the same manner whether or not he was in debt to him.

### 3. Mark Peterson

Sometime before 1982, Mark W. Peterson, a Minneapolis attorney, loaned respondent $1,500. There was no formal loan agreement, only an oral promise to pay interest. Respondent repaid this loan. In 1982 or 1983, respondent received an additional $300 from Peterson again on an informal basis. This loan was not repaid.

On at least six occasions after 1982, Peterson brought respondent parking tickets that he and his wife had been issued. Respondent dismissed these tickets after Peterson explained each one. During the same period of time, Peterson negotiated citations, mainly DWI's, issued to his clients with respondent. Peterson testified that he knew loaning the money to respondent was wrong and "really stupid" because of his continuing relationship with respondent's office, but said that, because respondent was such a "good guy," he considered it a loan to a friend.

The referee found that respondent's conduct in dismissing or delaying traffic tickets for Dauphin, Wallack and Peterson and negotiating cases with Peterson while respondent was indebted to each of them was a conflict of interest which violated DR 5–101(A) of the Minnesota Code of Professional Responsibility.

### Count II—Dismissal of Tickets in Exchange for Money and Favors

The referee found that, when respondent accepted cash and favors from Dauphin and Wallack, he must have known that the transfers were made for the purpose of influencing his action as a public official. Such knowledge, according to the referee, violated DR 1–102(A)(4), DR 5–107(A)(2) and DR 8–101(A)(3).

### Count III—Speeding Tickets Outside Respondent's Jurisdiction

The referee found that respondent had handled three tickets and had been involved in a fourth which had been issued outside Minneapolis. Despite the fact that respondent did not have the authority to handle tickets issued outside Minneapolis, he instructed that each ticket be placed in court status at Hennepin County with the effect that the tickets were removed from the court system for 2 years. The referee found that respondent's conduct in delaying disposition on tickets issued outside Minneapolis violated DR 1–102(A)(5), (6). At his disciplinary hearing, respondent denied handling traffic tickets issued outside Minneapolis. On appeal, however, respondent does not deny this allegation.

### Counts IV and V—Failure to File Timely Income Tax Returns

In a letter dated December 22, 1987, the Internal Revenue Service informed the director that respondent had failed to file timely his income tax returns for 1983 and 1984 and had failed to file at all in 1985 and 1986.[1] Respondent does not deny these allegations.

The referee found that respondent's failure to file his tax returns on time in 1983 and 1984 violated DR 1–102(A)(5), (6) and was contrary to this court's holding in *In re Bunker*, 294 Minn. 47, 199 N.W.2d 628 (1972). The referee also concluded that respondent's failure to file any tax returns in 1985 and 1986 violated Rule 8.4(b), (d) of the Minnesota Rules of Professional Conduct as well as the rule of *In re Bunker*.

The referee, based on his findings of fact and conclusions of law, recommended that respondent be indefinitely suspended from the practice of law for a period not less than 2 years.

---

1. Respondent has subsequently filed his 1985 and 1986 returns.

On appeal, respondent contends that the referee erred when he recommended a 2-year suspension. Respondent does not appear to deny any of the referee's findings regarding his misconduct. Rather, respondent contends that the referee did not give enough weight to factors which mitigate the income tax violations and conflicts of interest. For purpose of analysis, it is helpful to look at each mitigation claim separately.

A. *Mitigation of Income Tax Violation*

Respondent's personal problems began in 1980 when his older brother contracted throat cancer and was given 2 to 6 months to live. While respondent's brother eventually recovered, respondent's troubles continued. In 1983, respondent's father passed away at age 95. In 1984, respondent's divorce from his wife of 26 years became final after being contested for 1½ years. In 1985, respondent's conduct detailed in Counts I–III of this memorandum came to light and respondent was fired from his job as deputy city attorney and subsequently indicted. Respondent contends that these circumstances so overwhelmed him that he developed a psychological disorder which prevented him from filing his income tax returns on time.

On January 22, 1988, respondent began seeing Dr. Barbara Dorsett, a licensed consulting psychologist. At the time of the disciplinary hearing, respondent had seen Dr. Dorsett a total of seven times. Five of these visits were for diagnosis and two were for treatment. Dr. Dorsett testified that respondent suffered from a "phobic reaction," an anxiety-related disorder which prevented him from preparing his taxes and completing other financial tasks. As explained by Dr. Dorsett, a "phobic reaction" occurs when a person experiences anxiety in association to a particular stimulus even though that stimulus is not frightening and would not normally produce the anxiety it does. She believed that respondent's "phobic reaction" resulted from the occurrence of the above events within a relatively short period of time. While respondent's disorder caused him to neglect many of his financial affairs, it is not clas-sified as severe in the Diagnostic and Statistical Manual of Mental Disorders, a manual used for diagnostic purposes by psychologists.

Dr. Dorsett further testified that the treatment for respondent's phobic reaction would involve gradual desensitization to the object of the phobia. She estimated that it would require approximately 6 months for respondent to become desensitized enough to begin his taxes and then another 2 years before he could get all his financial affairs in order. Dr. Dorsett was of the opinion that if respondent suffered no further trauma and continued with treatment, he would completely recover. Despite this testimony, the referee concluded that respondent's psychological disorder did not mitigate his income tax violations.

The referee found that respondent failed to establish any of the five factors required to prove mitigation as outlined in *In re Weyhrich*, 339 N.W.2d 274 (Minn. 1983). In *Weyhrich*, this court held that, before a respondent attorney can raise a psychological disability as a mitigating factor, he or she must prove by clear and convincing evidence that the following five factors exist:

1. That the psychological problem is severe,

2. That the psychological problem was the cause of the misconduct,

3. That he or she is undergoing treatment and is making progress towards recovery,

4. That the recovery has arrested the misconduct, and

5. That the misconduct is not apt to recur.

*In re Weyhrich*, 339 N.W.2d at 279.

While it is arguable that respondent's psychological problem was the cause of his misconduct, none of the other *Weyhrich* factors were proven by clear and convincing evidence. As previously mentioned, Dr. Dorsett, respondent's psychologist, testified that respondent's psychological disorder was not classified as severe. Additionally, at the time of the hearing, respondent had been in treatment approximately 2

months and had only seen Dr. Dorsett seven times, five of which were for diagnosis. As a result, Dr. Dorsett was unable to determine if respondent had made any progress towards recovery and could only engage in conjecture as to whether respondent's recovery would arrest the misconduct or whether it was apt to recur.

Respondent argues that his case is factually similar to *In re Knutson,* 405 N.W.2d 234 (Minn.1987). In *Knutson,* this court ruled that Knutson's failure to file income tax returns and pay attorney registration fees was mitigated by his excellent reputation, lack of complaints about his law practice, lack of tax liability and numerous family problems. *In re Knutson,* 405 N.W.2d at 240.

■ If respondent was only guilty of failure to file timely income tax returns, he might have a strong argument for mitigation under *Knutson.* One important circumstance, however, distinguishes respondent's situation from that in *Knutson.* While Knutson had no other complaints against him, respondent is also subject to discipline for his misconduct as deputy city attorney for the City of Minneapolis.

### B. *Mitigation of the Conflict-of-Interest Charges*

Respondent's sole defense to the charges detailed in Counts I–III of this memorandum is that he was a "gullible, lenient, compassionate prosecutor who would have handled those same matters identically had he not been indebted to the individuals involved." The referee did not consider whether respondent had a defense to the conflict-of-interest charges against him, and this court need only consider the question briefly.

Respondent's brief provides much evidence which would tend to establish that he was a lenient prosecutor responsible for reducing a large backload of cases, that he dealt leniently even with people who did not owe him money, and that he would have handled the tickets identically had he not been indebted to the individuals. However, neither the director nor the referee charged respondent with the exchange of

traffic dispositions as a quid pro quo for the loans. Instead, they charged him with a conflict of interest between his public duty and personal interests.

■ Respondent's lenient nature does little to negate the conflict-of-interest charges. These charges do not result from his treating creditors favorably, but, rather, from dealing with them at all. This misconduct is not mitigated or lessened by respondent's claim that he would have dismissed the creditors' tickets even if he had not been indebted to them.

The only task remaining for this court is to determine the appropriate disciplinary sanction for respondent's income tax violations and his misconduct while serving as deputy city attorney for Minneapolis. The referee recommended that respondent be suspended for not less than 2 years. While this court places great weight on the referee's recommendation, it also recognizes that it has the final responsibility for determining the appropriate sanctions. *In re Gubbins,* 380 N.W.2d 810, 812 (Minn.1986); *In re Pearson,* 352 N.W.2d 415, 419 (Minn. 1984).

■ The appropriate disciplinary sanction for attorneys who violate state or federal income tax laws is generally suspension or disbarment absent extreme or extenuating circumstances. *In re Bunker,* 294 Minn. 47, 55, 199 N.W.2d 628, 632 (1972); *In re Johnson,* 414 N.W.2d 199, 201 (Minn.1987). While respondent may have shown mitigating factors akin to *Knutson* in regard to his income tax violations, this mitigation is meaningless due to the severity of defendant's misconduct as deputy city attorney.

Until now, this court has never been presented with the duty of disciplining a public prosecutor for conflicts of interest and other misconduct committed while in office. As no precedent exists to guide the court in its task, we consider the following in arriving at discipline:

First, the referee found that respondent's misconduct violated no less than four mandatory disciplinary rules contained in the Minnesota Code of Professional Re-

sponsibility in effect at the time of respondent's misconduct. The disciplinary rules which respondent violated include DR 5–101(A) (an attorney shall not accept employment if the exercise of his professional judgment may be affected by his own financial or personal interests); DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 5–107(A)(2) (without consent of the client after full disclosure, a lawyer shall not accept from one other than the lawyer's client anything of value related to the representation of or the lawyer's employment by the client); and DR 8–101(A)(3) (a lawyer who holds public office shall not accept anything of value from any person when the lawyer knows or it is obvious that the offer is for the purpose of influencing the lawyer's action as a public official). If respondent had been a private attorney during the time in question, his violation of the above disciplinary rules would call for strong sanctions. Accordingly, the fact that respondent was a public official entrusted with the evenhanded administration of justice warrants a very severe sanction.

Second, courts in other jurisdictions have imposed severe disciplinary sanctions on lawyers serving as public officials for even minor violations of the public trust. In *In re Weishoff,* 75 N.J. 326, 382 A.2d 632 (1978), the New Jersey Supreme Court suspended a municipal prosecutor for 1 year for his involvement in the improper disposition of *one* traffic ticket. In imposing such a harsh sanction on Weishoff despite his lack of personal gain, the court stated that prosecutors, like judges, are required to administer justice with an even hand. A judge or prosecutor who does favors is, according to the *Weishoff* court, "morally an embezzler. He is also a fool, for a judge who plays a 'good' fellow for even a few must inevitably be stained with the reputation as a man who can be reached." *In re Weishoff,* 75 N.J. at 331, 382 A.2d at 635 (quoting *In re Mattera,* 34 N.J. 259, 276, 168 A.2d 38, 47 (1961)). In *Matter of Rosen,* 88 A.D.2d 125, 452 N.Y.S.2d 435 (1982), an attorney serving as a hearing officer for a parking violations bureau was suspended for 2 years after improperly and illegally dismissing traffic tickets issued to his friends. Again, the attorney did not receive any personal gain and had an otherwise unblemished record. The *Rosen* court, however, felt that the 2–year suspension was merited because "[r]espondent's offenses * * * severely compromised the integrity of the adjudicatory processes of the Parking Violations Bureau and the very core function of respondent's former office." *Id.* at 127, 452 N.Y.S.2d at 436.

In another New Jersey case, a judge who often lunched with and at the expense of attorneys and parties who appeared before him was suspended for 6 months. *In re D'Auria,* 67 N.J. 22, 334 A.2d 332 (1975). Despite the lack of any evidence that preferential treatment was given those who paid for the judge's lunches, the court imposed a 6–month suspension because "[a]side from the obvious appearance of impropriety * * * acceptance of gratuities and favors from those who have business with [the court] is inherently wrong. It has a subtle, corruptive effect, no matter how much a particular judge may feel that he is above improper influence." *In re D'Auria,* 67 N.J. at 24–25, 334 A.2d at 333.

Clearly, each of these cases supports the proposition that lawyers who violate the public trust deserve severe disciplinary sanctions.

Third, as the director points out, the American Bar Association Standards for Imposing Lawyer Sanctions support an indefinite suspension. ABA/BNA Lawyers' Manual on Professional Conduct (ABA/BNA) 01:831 (1986). Standard 5.22 provides: "Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedure or rules, and causes injury * * * to the integrity of the legal process." *Id.* The commentary to Standard 5.22 states that "suspension is an appropriate sanction when lawyers who are public officials knowingly act improperly, but not necessarily for their own benefit." *Id.* The sanction of indefinite suspension for at least 2 years for respondent's misconduct while a deputy city attorney is well

within precedents established in other jurisdictions and the ABA recommendations.

Lastly, the purpose of attorney discipline is "not primarily punitive but 'to guard the administration of justice and to protect the courts, the legal profession and the public'." *In re Serstock,* 316 N.W.2d 559, 561 (Minn.1982) (quoting *In re Hanson,* 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960)). An indefinite suspension for at least 2 years certainly punishes respondent, but it also furthers the goals of guarding the administration of justice and protecting the legal profession and the public. Respondent's misconduct as a deputy city attorney harmed no one person individually. The harm in this case was to the public and the legal system as a whole. Respondent's actions, widely publicized, can only serve to reduce the public's trust and belief in the fair handling of traffic tickets. While public opinion alone should not condemn respondent in this case, where respondent's actions clearly warrant rebuke, stern disciplinary sanctions will help to restore the public's trust in the legal system. Furthermore, the appropriate sanction in this case will serve as a warning that future misconduct which in any way impinges on the integrity of the legal system or the fair administration of justice will not be tolerated.

Accordingly, it is the order of this court that:

1. Respondent be and hereby is indefinitely suspended from the practice of law in this state.

2. Respondent shall not be eligible to file a petition for reinstatement before December 1, 1990.

3. Respondent shall comply with all requirements of Rule 18 of the Rules of Professional Responsibility for lawyers in this state.