604 A.2d 100

IN THE MATTER OF BENNETT E. BOZARTH, JUDGE OF THE PEMBERTON MUNICIPAL COURT.

Argued March 26, 1991—Remanded May 7, 1991.

Submitted January 28, 1992—Decided April 10, 1992.

*Michael L. Barry* argued the cause for complainant, Advisory Committee on Judicial Conduct (*Patrick J. Monahan, Jr.,* Counsel, attorney).

*William J. Prout, Jr.,* of *Tomkins, McGuire & Wachenfeld* argued the cause for respondent (*Hartman, Marks & Nugent,* attorneys; *William J. Prout, Jr.* and *William C. Sandelands* of *Tomkins, McGuire & Wachenfeld,* on the letter brief).

PER CURIAM.

This action against respondent, Bennett E. Bozarth, a Municipal Court judge, arises out of a complaint filed with the Advisory Committee on Judicial Conduct (ACJC). The ACJC found that respondent had dealt inappropriately with a defendant who was talking in respondent's courtroom, trivialized another defendant's right to counsel, and implemented an inappropriate system for handling tardy defendants. That system resulted in one defendant, who was charged with violating a parking ordinance, being handcuffed to a bench in the police station for several hours. Our review of the record leads us to conclude that clear and convincing evidence supports the findings of the ACJC. Accordingly, we find that respondent violated the standards of judicial conduct, and order a public reprimand.

–I–

As found by the ACJC in its presentment, the relevant facts are:

Respondent presided over the January 4, 1989 session of the Pemberton Township Municipal Court. During that session Respondent observed a man, later identified as Orlando Caceres, speaking to a woman seated next to him. Respondent and Caceres engaged in the following colloquy:

The Court: All right. Now, were you talking to the lady next to you or was that my imagination?

A Voice: I was speaking to her.

The Court: Why is that?

A Voice: She asked me something, so I answered her.

The Court: Were you here when I began court?

A Voice: I walked in as soon as you called my name.

The Court: Did you hear me say earlier that there was no talking in court for any reason?

A Voice: No, I didn't.

The Court: Hm-hm. Do you see that sign over there?

A Voice: I can read it.

The Court: Well, why don't you keep your mouth shut then? No, no, no, I'm not ready to let you go. I asked you a question. Why can't you keep your mouth shut when you're in court? I'm listening.

A Voice: When somebody talks to me, I answer.

The Court: Not in here you don't, you're going to sit right up there and then you and I are going to deal with this at the end of court. Have a seat.

The tape recording of the court session contains no indication that Caceres' conversation with the woman seated next to him was disruptive of the ongoing court proceeding. Indeed, the conversation must have been very subdued because the tape machine did not pick it up. Nevertheless, Caceres was detained until the completion of contested matters that day, at which time Respondent denied Caceres' request for assigned counsel and rescheduled the trial of his case. Respondent made no mention to Caceres of the earlier incident involving talking in the courtroom.

During the same court session, Respondent began to take a guilty plea from Robert Brayman, who was charged with possession of drug paraphernalia in violation of *N.J.S.A.* 2C:36–2, a disorderly persons offense. Respondent asked Brayman whether he wished to proceed without an attorney or to be represented by counsel. Brayman stated that he wished to plead guilty whereupon Respondent said that he would allow the plea but first needed to know whether Brayman wanted counsel. The following colloquy then took place:

The Court: I'm not going to stop you from that, but I have to go through this drill and ask you if you wanted a lawyer or not.

Mr. Brayman: I understand.

The Court: They make me do it. I know you don't want one, you know you don't want one, but I have to go through this and waste your time anyhow. Do you want one or don't you?

Mr. Brayman: No, sir.

> Following the above colloquy, Respondent accepted Brayman's plea of guilty and then asked Brayman whether he had anything to say before imposition of sentence. Brayman explained that he was only a passenger in the car in which the drug paraphernalia was found, and he denied ownership of the paraphernalia. Respondent then withdrew Brayman's guilty plea and rescheduled the matter for trial at a later date.
>
> [Exhibit references omitted.]

The most troublesome charges against respondent arise out of a third incident, one involving Pamela Beckford in the Pemberton Municipal Court. As described in the presentment, the essential facts are that Ms. Beckford was scheduled to appear at that session in response to a complaint charging her with violation of an ordinance that prohibited parking a disabled vehicle on one's property. The court session began at 10:00 a.m., and Ms. Beckford arrived five to twenty minutes late. Respondent called her case before her arrival. On hearing no response, he instructed the clerk to issue a bench warrant with a $400 bail requirement. When Ms. Beckford arrived, a township zoning official told her to report to the clerk's window. She complied. The clerk told her that there was a warrant for her arrest and she must post $40 to obtain her release. Ms. Beckford said she did not have that much money with her. At the clerk's instruction, a Pemberton police officer arrested Ms. Beckford and handcuffed her to a bench in the police headquarters, which are in the same building as the courtroom. She remained handcuffed for several hours before the municipal prosecutor informed respondent of Ms. Beckford's arrest. At respondent's direction, Ms. Beckford was brought before the court. She informed respondent that the reason she was late was that she had had to walk to the courtroom. Respondent released her on her own recognizance and rescheduled her case.

After oral argument before us, we were sufficiently concerned to remand the matter to the ACJC for further information. In response, the ACJC provided us with more detailed fact-findings. The ACJC began its report by noting that although the witnesses did not agree on everything, their testimony was in accord on the material facts. We agree with the

ACJC that the testimony clearly and convincingly demonstrates the following facts:

Pamela Beckford was scheduled to appear in the Pemberton Township Municipal Court at 10:00 a.m. on March 19, 1990. She arrived late, after Judge Bozarth had called her name during his call of the list, but during the latter part of the call shortly after 10:00 a.m., and took a seat in the courtroom. A few minutes later, Frederick Haines, Code Enforcement Officer for Pemberton Township and the person who had issued the summons to Ms. Beckford, approached her and told her that the judge had ordered a bench warrant issued when she failed to respond during the call of the list. Mr. Haines told Ms. Beckford that the judge had set bail at $400 and that she would have to go outside to the court clerk's office to get another court date.

Ms. Beckford objected, but she subsequently left the courtroom and went to the payment window at the clerk's office. Annick Perez, Senior Clerk Typist of the Pemberton Township Municipal Court, was working at the window. Ms. Perez testified that she told Ms. Beckford to go into the courtroom and be seated. Ms. Beckford denies this and says the clerk advised her that a warrant had been issued for her arrest and she needed to post ten percent of a $400 bail. Ms. Perez stated that when Ms. Beckford did not go into the courtroom, she then informed Ms. Beckford that the judge had ordered the issuance of a bench warrant and had set bail at $400 and that it would be necessary to post 10% of the bail, $40. Ms. Beckford replied that they might as well arrest her because she had only $20.

It is significant that Ms. Perez was located behind a window, that she spoke through a window, and that she speaks in a low voice. Time and again the Committee had to ask her to speak louder. It certainly would make no sense for Ms. Beckford not to have returned to the courtroom, and the Committee believes that she did not understand that she had that option.

Kathleen Ireton, Deputy Clerk of the Pemberton Township Municipal Court, was sitting at her desk a few feet away from the window and she overheard the conversation between Ms. Beckford and Ms. Perez. When Ms. Ireton heard Ms. Beckford say that she might as well be arrested because she did not have the $40, Ms. Ireton typed up and signed the bench warrant that the judge had authorized during his call of the list. Ms. Ireton took the warrant into the courtroom and spoke to Police Officer Gabrielle Willitts, telling her what had occurred. Ms. Ireton and Officer Willitts left the courtroom, and Ms. Ireton pointed out Ms. Beckford, who was using a public phone in the corridor. Officer Willitts approached Ms. Beckford, waited a few minutes until she replaced the telephone, and then placed Ms. Beckford under arrest. The officer led Ms. Beckford into the processing room of the police department and completed the arrest report on which she indicated the time of the arrest as 10:34 a.m.

Officer Willitts had Ms. Beckford sit on a wooden bench to which were attached four sets of handcuffs used to restrain prisoners. The officer locked one of the handcuffs on Ms. Beckford's wrist.

A few hours later, the municipal prosecutor, Robert Weishoff, noticed Ms. Beckford handcuffed to the bench. After learning why she was there, Mr. Weishoff went into the courtroom and informed Judge Bozarth: "You have Pamela Beckford on the bench. Are you going to do her, or you ..." When Judge Bozarth said that he did not know what the prosecutor was talking about, the prosecutor replied: "The lady who came in 5 minutes late, black lady with the reddish hair, by the name of Pamela Beckford who is back on the bench, locked up". After some colloquy, Ms. Beckford was brought before Judge Bozarth, who advised her of her rights, entered a plea of not guilty on her behalf, rescheduled the case, and released her on her own recognizance.

On April 19, 1990, Ms. Beckford appeared before Municipal Court Judge Mary K. White and entered pleas of guilty to the zoning violation and to the charge of contempt for being late to court on March 19. Judge White fined Ms. Beckford $25 on the zoning charge, with $15 court costs, and imposed a fine of $10 on the contempt charge.

The witnesses before the Committee did not agree as to exactly when Pamela Beckford arrived in the courtroom on March 19, 1990. Ms. Beckford maintained that she arrived at 10:05 a.m., while others placed her arrival at a later point. The time of the arrest is listed on the arrest report as 10:34 a.m. and that, together with the testimony of Ms. Beckford and the witnesses who dealt with her prior to her arrest, suggests that the time of her arrival was approximately 10:15 a.m. In the Committee's opinion, the precise time of arrival is not relevant; what is relevant is that a citizen who arrived during the call was arrested and held in handcuffs on the authority of a bench warrant that was issued for her failure to appear even though she did appear, albeit some minutes late.

Likewise, the Committee does not consider it relevant to determine with precision exactly how many hours Ms. Beckford was kept handcuffed to the bench in the police station. She was arrested at about 10:30 a.m., and she was brought back before Judge Bozarth, according to the log of the court session, at approximately 1:00 p.m. What is relevant and of concern to the Committee is the fact of her confinement, as well as the length of that confinement, which was at least two and one-half hours.

There is no evidence before the Committee to indicate that Judge Bozarth had any direct knowledge of Ms. Beckford's arrest or of her being handcuffed to the bench until the prosecutor brought that information to his attention during the early afternoon of March 19. The evidence does show, however, that Judge Bozarth knew that some parties did not arrive precisely at 10:00 a.m. when court opened. He knew or should have known, after he ordered the bench warrant during his call of the list, that the warrant could issue immediately even if a [defendant] were only five minutes late. The judge had given no instructions to the clerk and he was no longer involved or concerned in the process thereafter. That Judge Bozarth did not actually know of the arrest and confinement is clear from the remarks he made when the municipal prosecutor brought the matter to his attention in the courtroom that afternoon. The same remarks, however, indicate that the judge was aware of the bench and of its function when used with the handcuffs. When the prosecutor told the judge

that Ms. Beckford was locked up on the bench, the judge did not inquire as to what bench the prosecutor was talking about. Judge Bozarth simply disavowed any knowledge of the situation and asked how Ms. Beckford had gotten there.

The Committee understands that Judge Bozarth has now changed his procedure so that warrants for arrest do not automatically issue when the call is completed. Late comers must sign in at the clerk's office, and warrants are not issued until after the end of the day.

[Exhibit references omitted.]

### Based on its findings, the ACJC concluded that

[respondent's] handling of the incident with Mr. Caceres is indicative of an obsession with order and decorum in the courtroom. Respondent overreacted to a very innocuous violation of his rule against talking for any reason in the courtroom. In his testimony before the Committee, Respondent explained that Mr. Caceres, through his body gestures, attempted to defy Respondent's order to stop talking. Although body gestures cannot appear in a transcript, the Committee does not believe that Respondent was threatened by Mr. Caceres. In fact, Respondent made no mention of any threatening gestures on the part of Caceres in his dealings with Caceres at the end of the court session.

The Committee, in its prior case involving Respondent, admonished him for holding people in contempt for non-disruptive talking in the courtroom. Respondent assured the Committee that in the future he would not hold people in contempt merely for talking in court. While Respondent did not hold Mr. Caceres in contempt of court, he subjected Mr. Caceres to the punishment of being rebuked in open court.

Respondent testified before the Committee that he is well aware of his duty to advise each and every defendant of the right to counsel and that he takes that duty very seriously. Given the incident involving Mr. Brayman, the Committee doubts Respondent's sincerity. Respondent's reference to his obligation to inform Mr. Brayman of his right to counsel as "this drill" does not indicate that he takes the right to counsel seriously. Indeed, it signals to the public the court's indifference to a defendant's constitutional rights. Further, Respondent suggested to Brayman that he proceed without an attorney even though Brayman faced a serious penalty. He told Brayman that he knew Brayman didn't want an attorney but that he had to waste Brayman's time and go through the meaningless procedure with him.

Respondent's conduct in the present case does not exist in a vacuum and the Committee must take into account its prior dealings with him. After very lengthy proceedings involving the Respondent in ACJC 86–64, the Committee privately reprimanded him for holding attorneys and litigants in contempt for talking in the courtroom when the talking did not disrupt proceedings and was not even discernible on the tape. In its letter of private reprimand, the Committee characterized Respondent's handling of talking in the courtroom as rigid and draconian. Respondent overreacted in the same way in the Caceres case. The Committee is well aware that a judge must maintain order and decorum in the courtroom, but Respondent has once again exercised poor judgment in such situations. Such a lack of proper judicial temperament not

only brings the judicial office into disrepute but also calls into question Respondent's fitness for judicial office.

The incident involving Ms. Beckford is truly symptomatic of Respondent's slavish adherence to his own concept of rules of procedure. In his testimony before the Committee, he expressed his firm belief that *R.* 3:3-1 requires that if a defendant fails to appear after being duly summoned to court, a warrant for that defendant's arrest must be issued immediately. Respondent further testified that he believes that he has no discretion as to when and under what circumstances a warrant for arrest shall issue, which is absurd. The Committee finds Respondent's policy to be draconian in that Ms. Beckford, who was charged with parking a disabled car on her property in violation of a local ordinance, was arrested, forced to post bail, and detained for several hours, all because she showed up no more than twenty minutes after the start of court.

The Committee does not believe that Respondent had no control over the activities of the police officer who arrested Ms. Beckford. As judge of the municipal court, Respondent is responsible for those who act pursuant to his orders, and the warrant for Ms. Beckford's arrest was issued pursuant to his order. His attitude regarding the warrant shows his inability to understand that his position as a judge requires use of discretion and not a literal adherence to his idiosyncratic conception of his judicial responsibilities.

Respondent's conduct in the matters involving Mr. Caceres, Mr. Brayman, and Ms. Beckford, coupled with the many instances of poor judgment in ACJC 86-64, displays a lack of appropriate judicial temperament. In the past, the Respondent has given the Committee numerous assurances he would change his ways, but the Committee has unfortunately found that its reliance on such assurances has been misplaced. The Respondent has demonstrated neither a desire nor an ability to change his ways so as to conform to acceptable standards of judicial conduct.

The ACJC found that respondent's conduct violated *Rule* 2:15-8(a)(6) and Canons 1, 3A(1), and 3A(3) of the Code of Judicial Conduct. Although the ACJC reported that "there is substantial sentiment that Respondent be removed," it recommended a public reprimand. One member dissented, considering it "improper to impute to Respondent the responsibility for any actions taken by the police officer after Ms. Beckford was arrested on the bench warrant." That member favored a private reprimand. We agree with the ACJC that the serious nature of the charges, particularly those involving Ms. Beckford, require a public reprimand.

–II–

Control of the courtroom is a basic judicial responsibility. That control, however, should not be accomplished through

sarcasm and intimidation. Before the ACJC, respondent attempted to justify his actions in the Caceres matter by stating that Mr. Caceres

was very confrontational. It was clear to me that this was someone who wanted to challenge the Court's authority * * *. And I also concluded that in the event that this exchange were to continue, his behavior would be even more provocative. And I also concluded that it was likely that his provocative behavior was due to the fact that he had an opportunity to impress the audience.

Judges, particularly those who preside in the informal atmosphere that often prevails at municipal courts, must have some latitude in correcting disruptive behavior. Tempting as it may be to join issue with an unruly litigant, the judge, however, must rise above the fray. More harm than good is done by posing rhetorical questions such as respondent directed at Mr. Caceres, "[w]hy can't you keep your mouth shut?" Respondent would have done better by simply directing Mr. Caceres to be quiet.

Concerning the Brayman matter, respondent sought to justify the manner in which he had advised Mr. Brayman of his constitutional rights by stating that Mr. Brayman had become disturbed because he apparently thought that respondent would not allow him to plead guilty. Thus, according to respondent, he adopted an offhand manner to calm down Brayman. At the hearing before the ACJC, respondent stated that he has since modified the manner in which he informs defendants of their constitutional rights. He was reluctant, however, to acknowledge the inappropriateness of the manner in which he had addressed Mr. Brayman. He testified:

Q. [D]on't you think that there's implicit in your comment about wasting time, et cetera, a criticism of the opinion of a higher court when you say something of that sort to the people who are sitting around listening to it, I'm being obligated to do this because someone else has caused me to do it, this is just a waste of time?

A. That is not the impression I wanted to convey.

Q. I know, but don't you think that that is the impression you might be conveying?

A. That wouldn't have occurred to me, sir. However—

Q. It still doesn't occur to you?

A. Well, what occurs to me is that it's obviously offensive to someone or else I wouldn't have been reading about it in the complaint.

Q. Do you think it might be offensive to the United States Supreme Court?

A. Let me put it this way, I have elected to respond differently when a person does not wish me to complete the procedure that I employ for advising them of their rights and taking their plea.

In sum, while informing Mr. Brayman of his constitutional rights, respondent simultaneously told Brayman that the advice was a "waste [of] your time." Both this Court and the United States Supreme Court take the right to counsel more seriously. We have consistently said that a judge's obligation to inform defendants of their right to counsel is of paramount importance. *See State v. Gonzalez*, 114 *N.J.* 592, 608, 556 *A.2d* 323 (1989) (municipal court's failure individually to inform defendant of his right to counsel was constitutional infirmity requiring remand for new trial). We agree with the ACJC that respondent's conduct was inappropriate. We cannot expect the public to maintain confidence in the judicial system if judges treat constitutional rights as minor obstacles to the disposition of cases.

The most serious charge arises out of the Beckford matter. When he ordered issuance of a bench warrant on the first and only call of the list, respondent knew or should have known that nothing prevented its immediate execution. We do not doubt that respondent's inflexible attitude rubbed off on his court staff. Respondent's deputy court clerk testified that once she issued the warrant and the police officer arrested Ms. Beckford, the clerk had no further responsibility.

–III–

As we have often noted, the municipal court is where "most citizens have their sole exposure to the judicial process. The respect they have for the judiciary hinges upon that experience." *In re Mattera*, 34 *N.J.* 259, 275, 168 *A.2d* 38 (1961). Municipal court judges are prominent in the community, and their reputations are quick to spread. A reputation for stern-

ness may be appropriate or helpful in some settings, but a judge should never attempt to cultivate such a reputation with displays of arrogance, bad temper, or disregard for the rights of defendants. Such conduct, even when used to maintain order, can erode public confidence in the judicial system.

A fundamental purpose of judicial disciplinary proceedings is to restore that confidence. *See In re Santini,* 126 *N.J.* 291, 298, 597 *A.*2d 1388 (1991). All respondent's misconduct occurred in public, on the bench, while he was discharging his duties as a judge. The Caceres matter occurred less than one year after respondent had received a letter of admonition from the ACJC for "a pattern of over-reaction to situations" and had represented to the ACJC that he would change his approach and procedures.

Respondent's denigration of Brayman's constitutional rights was unbecoming a judicial officer. The most disturbing impropriety involves the shackling of Ms. Beckford. So concerned were we that we remanded the matter to the ACJC for further fact-finding on that issue. We are satisfied that respondent did not have actual knowledge that Ms. Beckford was handcuffed to a bench in police headquarters. We are dissatisfied, however, with the procedures that yielded that result. As she presented herself that morning, Ms. Beckford was a citizen charged with the violation of a local ordinance who had missed the only calendar call and had arrived twenty minutes late. The deputy court clerk believed she was acting in accordance with standard operating procedures when she authorized the execution of a warrant for the arrest of Ms. Beckford. Even accepting respondent's testimony that he was unaware that Ms. Beckford had been arrested and was shackled to a bench in police headquarters, his ignorance is unacceptable. The judge is the ultimate authority in the courtroom. The judge's responsibility is to assure the existence of procedures and protocols

that will inspire public confidence in the courtroom as a place of justice. Accordingly, a public reprimand is warranted.

So ordered.

*For reprimand*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

The Advisory Committee on Judicial Conduct having filed a presentment with the Supreme Court, recommending that BEN-NETT E. BOZARTH of the Pemberton Township Municipal Court, be publicly reprimanded for violating *Rule* 2:15–8(a)(6) and *Canon* 1, *Canon* 3A(1), and *Canon* 3A(3) of the *Code of Judicial Conduct,* and good cause appearing;

It is ORDERED that Judge BENNETT E. BOZARTH is hereby publicly reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State.