[No. S064923. May 13, 1999.]

RICHARD J. OBERHOLZER, a Judge of the Superior Court, Petitioner,
v.
COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

372

374

**COUNSEL**

Lewis, D'Amato, Brisbois & Bisgaard, James E. Friedhofer and Lisa K. Roberts for Petitioner.

Jack Coyle for Respondent.

**OPINION**

**THE COURT.**—This original writ proceeding presents the following issues: (1) whether the Commission on Judicial Performance (Commission)

has authority to issue a confidential advisory letter (commonly known as a "stinger" letter); (2) whether the issuance of such a letter amounts to "discipline" that implicates a judge's right to due process of law; (3) whether such a letter may be issued based upon a perceived legal error committed by a judge; and (4) whether petitioner here, Judge Richard J. Oberholzer, committed sanctionable legal error in dismissing a criminal case after the People indicated they were not ready to proceed.

As we shall explain, we conclude that the Commission has authority to issue advisory letters, that such letters are a form of discipline, that the Commission's procedures comport with the requirements of due process of law, and that such letters may be based upon a perceived legal error, if such error clearly and convincingly reflects bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty. In the instant case, petitioner's dismissal of a criminal action, following the People's declaration of unreadiness, did not constitute such sanctionable conduct.

Accordingly, we find that the Commission improperly issued its advisory letter to petitioner.

FACTS

### A. The Commission's Staff Inquiry Letter

By letter dated December 6, 1996, the Commission invited petitioner to "comment regarding a report that is before the commission." In pertinent part, the inquiry letter contained the following summation:

"It is reported that in the criminal case *People* v. *James*, Kern County Superior Court case no. 65661, defendant Keith James was charged with one felony count of committing a lewd and lascivious act upon his nine-year-old niece Alicia A. Reportedly, the preliminary hearing was held on January 12, 1996, and on January 17, 1996, an information was filed charging James with the felony. James reportedly successfully moved for one continuance, and the case was set for jury trial to begin on April 8, 1996.

"It is reported that on Monday, April 8, 1996, the trial was trailed to the following day because no courtroom was available for assignment. On April 9, 1996, Deputy District Attorney John Somers, who was the trial attorney assigned to the case, reportedly advised you that another of his cases, *People* v. *Hammock*, had been assigned to Department 2 for trial and was expected to run until the middle of the following week. You then set a trial date of Thursday, April 11, 1996.

"On April 11, 1996, you were reportedly advised by Deputy District Attorney Elizabeth Anderson that the case had been reassigned from DDA Somers to a different trial attorney the day before; you sent the case to Department 8 (Judge Kenneth C. Twisselman, II) for trial. Reportedly, defendant James and his attorney and Chief Deputy District Attorney Dan Sparks reported to Department 8, where DDA Sparks told Judge Twisselman that the prosecution was not ready to proceed because the case had been assigned to the trial attorney only the day before. Judge Twisselman reportedly told the parties to return to Department 1 to explain to you the prosecution's request for a continuance.

"Reportedly, the parties returned to Department 1. You reportedly sent them back to Department 8, without discussion. You then reportedly had a telephone conversation with Judge Twisselman during which you reportedly suggested that the prosecution's motion to continue should be denied. When the parties appeared in Department 8 for a second time, Judge Twisselman reportedly told them to return to Department 1.

"When the parties returned to Department 1, the prosecution advised the court that they were not ready to proceed because of the recent reassignment of the case. The prosecution requested a continuance of the trial until the following Monday (April 15) to allow the recently assigned trial attorney time to prepare. Reportedly, the 10-day period following the scheduled trial date, after which the case would be required to be dismissed pursuant to Penal Code section 1382, did not expire until April 18. It is reported that you denied the motion to continue on the grounds that no written motion to continue had been filed and the court had a heavy calendar of cases to be tried. DDA Sparks reportedly refused to return to Department 8 for trial and cited the case of *People* v. *Ferguson* [(1990) 218 Cal.App.3d 1173 [267 Cal.Rptr. 528]]. Reportedly, the defense then moved to dismiss, and you granted the motion on the grounds that the prosecution was not prepared to proceed to trial and had failed to file a written motion to continue the case. The hearing on the matter reportedly concluded as follows:

" 'Mr. Sparks: Does the Court remember its reversal in *People* v. *Ferguson*? This is the same mistake you made in that case.'

" 'The Court: That's the ruling of the Court.'

"In *People* v. *Ferguson* (1990) 218 Cal.App.3d 1173 [267 Cal.Rptr. 528], the Court of Appeal reversed an order entered by you dismissing a criminal case that had been trailed from the original trial date when the DDA assigned to the case was unable to proceed on the date set for trial. . . ."

## B. *Petitioner's Response*

By letter dated January 27, 1997, petitioner responded to the Commission's letter, in pertinent part contending that he had ruled correctly in dismissing People v. James. The response asserted that the deputy district attorney assigned to the case, John Somers, had known in advance that he would be unable to try the case on the assigned date, yet failed to move for a continuance in writing or orally on April 8, 1996.

The response also reviewed certain provisions contained within Penal Code section 1050, governing motions for continuance of a criminal trial. As set forth more fully in the margin, the statute requires that a noticed motion be filed at least two court days prior to the hearing sought to be continued, and within two court days of learning of a conflict in the scheduling of any court hearing. (Pen. Code, § 1050, subd. (b).)[1] A party's failure to comply with these statutory requirements is excusable upon a showing of good cause. (§ 1050, subd. (c).) If the party seeking the continuance is unable to

---

[1] Penal Code section 1050 provides in pertinent part:

"(a) The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time. . . .

"(b) To continue any hearing in a criminal proceeding, including the trial, (1) a written notice shall be filed and served on all parties to the proceeding at least two court days before the hearing sought to be continued, together with affidavits or declarations detailing specific facts showing that a continuance is necessary; and (2) within two court days of learning that he or she has a conflict in the scheduling of any court hearing, including a trial, an attorney shall notify the calendar clerk of each court involved, in writing, indicating which hearing was set first. A party shall not be deemed to have been served within the meaning of this section until that party actually has received a copy of the documents to be served, unless the party, after receiving actual notice of the request for continuance, waives the right to have the documents served in a timely manner. Regardless of the proponent of the motion, the prosecuting attorney shall notify the people's witnesses and the defense attorney shall notify the defense's witnesses of the notice of motion, the date of the hearing, and the witnesses' right to be heard by the court. The superior and municipal courts of a county may adopt rules, which shall be consistent, regarding the method of giving the notice or waiver of service required by this subdivision, where a continuance is sought because of a conflict between scheduled appearances in the courts of that county.

"(c) Notwithstanding subdivision (b), a party may make a motion for a continuance without complying with the requirements of that subdivision. However, unless the moving party shows good cause for the failure to comply with those requirements, the court may impose sanctions as provided in Section 1050.5.

"(d) When a party makes a motion for a continuance without complying with the requirements of subdivision (b), the court shall hold a hearing on whether there is good cause for the failure to comply with those requirements. At the conclusion of the hearing the court shall make a finding whether good cause has been shown and, if it finds that there is good cause, shall state on the record the facts proved that justify its finding. A statement of the finding and a statement of facts proved shall be entered in the minutes. If the moving party is unable to

demonstrate good cause for failing to comply with the notice requirements, the motion for continuance shall not be granted, and the court may impose sanctions as provided in section 1050.5. (§ 1050, subds. (c), (d).)[2]

In his response letter, petitioner asserted that when the foregoing procedural requirements are not met by a prosecuting attorney seeking a continuance, witnesses' lives and schedules are disrupted, appropriate legal redress for victims may be impacted if witnesses are unavailable, defendants are left unable to prepare an opposition to the motion for continuance, and court clerks are denied the opportunity either to work out conflicts and priorities on their own or to expose a lack of true conflict. Relying upon sections 1050, subdivision (c), and 1050.5, petitioner argued that if the moving party fails to show good cause, the motion for continuance must be denied, and the movant's counsel may be subject to a monetary sanction and to the filing of a report with an appropriate disciplinary committee.

Petitioner's response emphasized the People's failure to properly request a continuance. Petitioner contended that Deputy District Attorney Somers appeared before him in department 1, on April 8, 1996, and the jury trial was trailed to the following day. On April 9, the case was put over to April 11, because Somers was in trial on another case. Petitioner informed him that a new prosecutor would have to be assigned in People v. James. On April 11, Deputy District Attorney Elizabeth Anderson appeared before petitioner and stated that, on the previous day, Deputy District Attorney Carla Grabert had been reassigned to replace Somers as trial counsel in James. Petitioner sent the matter to trial before Judge Twisselman, who presided in department 8.

Petitioner believes that when the parties arrived in department 8, Chief Deputy District Attorney Dan Sparks appeared on behalf of the People, requesting a continuance. Judge Twisselman sent the parties back to department 1, where motions for continuance were considered. Petitioner sent the parties back to department 8, because a motion for a continuance had not

---

show good cause for the failure to give notice, the motion for continuance shall not be granted."

All further undesignated statutory references are to the Penal Code.

[2]Section 1050.5 provides:

"(a) When, pursuant to subdivision (c) of Section 1050, the court imposes sanctions for failure to comply with the provisions of subdivision (b) of Section 1050, the court may impose one or both of the following sanctions when the moving party is the prosecuting or defense attorney:

"(1) A fine not exceeding one thousand dollars ($1,000) upon counsel for the moving party.

"(2) The filing of a report with an appropriate disciplinary committee.

"(b) The authority to impose sanctions provided for by this section shall be in addition to any other authority or power available to the court."

been filed. He recalls that, "It is possible that on this trip Sparks indicated his desire to make a record." Petitioner believes that he informed the prosecutor that the proper place in which to make that record was before Judge Twisselman in department 8.

After the parties returned to department 8, Judge Twisselman called petitioner to discuss the case. They agreed that the matter should be heard in department 1. Deputy District Attorney Sparks thereafter informed petitioner that the People were not ready to proceed to trial, but that Deputy District Attorney Grabert would be ready to proceed on April 15. (The last day on which the trial could commence under the relevant statute was April 18, but section 1050, subdivision (g), permitted that deadline to be extended 10 days, until April 28.) Deputy District Attorney Sparks orally moved for a continuance, which was denied, as set forth in the following colloquy:

"DDA Sparks: 'The People are not ready. The assigned attorney is Mr. Somers. He is engaged in another case in Department 2. I don't know what facts were presented to the Court this morning, but I'm here requesting a continuance of the case until Monday, because we are going to reassign the trial to Carla Grabert in an effort to accommodate this Court's congested trial calendar. However, she has not even read the file because of other case commitments. She will be ready Monday morning [April 15]. If the court would like to send this [case] to Department 8 to commence Monday, that's perfectly acceptable to me and to the victims in the case, but the People are not ready. The last day for trial is [April] 18th, and in fact under [section] 1050 [subdivision] (g), it's the 28th of April.'

"The Court: 'Well, I have April 18th as the last day this can go to trial, number one; number two, this case has been on the trial calendar since Monday of this week [April 8]. Mr. Somers was sent out on his case last week. He was sent out on a case that was going to go two weeks. It was known to the District Attorney's Office at that time that he would be unavailable to try this case within the statutory time limit. I had been telling him that it was April 18th, I believe I began telling you that on Monday, and there has been no attempt apparently to reassign the case.

" 'We have courts available, and I have an extremely heavy calendar of cases that have to get out and cases that have to get out next week. This is one of the cases that we show that ha[s] to get out next week. Conse-quently—there was no motion filed with this Court to continue this case, I've been trailing it on a day-to-day basis, and the Court requires two days notice, pursuant to statute, for a motion to continue. None was ever filed

with the Court, knowing that Mr. Somers was going to be in trial and would not be available to try this case.

. " 'With that in mind, your motion to continue is denied and this [case] is sent to Department 8. You will have to start your trial.'

"DDA Sparks: 'We will not do that, Your Honor. We refuse to proceed. You can deal with it here, because [Judge Twisselman is] going to send it back up here. I suggest the Court read *People* v. *Ferguson.*

" 'Here is the position of the People. We are the executive authority under the Constitution. We pick the prosecutor. The last day for trial under [section] 1050[, subdivision] (g) in this case is the 28th of April. It is pointless to accommodate this Court by reassigning cases in an effort to assist with this congested calendar, because I am going to leave this case with Mr. Somers, I am not going to reassign it to Carla Grabert.'

"The Court: 'The District Attorney's Office is welcome to do what they want, but if there is a motion by defense counsel to dismiss because you are not ready to go, the Court's going to listen to that.'

"DDA Sparks: 'Under what grounds? [Section] 1385 requires that you state the grounds.'

"The Court: 'I will state that if it happens. There was no motion to continue this case before the Court, and you knew that Mr. Somers was not going to be available within the statutory time period.'

"DDA Sparks: 'It's not ready.'

"The Court: 'The Court is ready to send this case out. You've been notified. They answered up at readiness time. It was confirmed for trial at readiness. There was no motion to continue since that time, and that was ten, eleven, twelve, thirteen or fourteen days ago. [¶] Mr. McKnight?'

"[Defense Counsel] Mr. McKnight: 'Yes, Your Honor. At this time, based on the Court's findings at this time, I make a motion to dismiss.'

"The Court: 'All right. The Court, understanding that the People are not prepared to go to trial and they are not desirous of pursuing this case—'

"DDA Sparks: 'That is a misstatement of the facts.'

"The Court: '—at this time—'

"DDA Sparks: 'We are unable to proceed because we're not prepared. The record is quite clear on that.'

"The Court: '—and the Court notes that there is no motion to continue this case—'

"DDA Sparks: 'I just made one orally.'

"The Court: '—none has been filed with the Court, and that the District Attorney's Office knew well in advance of this case that we have a number of cases to get out, I am going to grant the defendant's motion.'

"DDA Sparks: 'You haven't satisfied the requirements of [section] 1385, Your Honor. Would you please do that?'

"The Court: 'What else do you want?'

"DDA Sparks: 'You must specify on the record the good cause, because you do not have grounds under [sections] 1381 or 1382.'

"The Court: 'The good cause is that this case is ready, was ready to go to trial—the defendant is ready, I presume—'

"Mr. McKnight: 'Ready, Your Honor.'

"The Court: 'Is ready to go to trial, there are courtrooms available, and the case was set for trial as of Monday and there has been no motion to continue.'

"DDA Sparks: 'I just made it orally.'

"The Court: 'Until you stepped into court, but failing to comply with the provisions for a motion to continue.'

"DDA Sparks: '[Section] 1050 provides for oral motions to continue. The penalty is sanctions for not filing it.'

"The Court: 'The Court does not find good cause for you waiting until the date this case is sent out to trial to make a motion when you knew well in advance if you had problems with the case and the assignment of the case.'

"DDA Sparks: 'Does the Court remember its reversal in *People* v. *Ferguson*? This is the same mistake you made in that case.'

"The Court: 'That's the ruling of the Court.' "

In his response to the Commission, dated January 12, 1997, petitioner explained that he "anticipated that the assigned DDA could seek 'logistical remedies' in the form of using the balance of the day (beginning in the afternoon) to pick a jury and/or conduct other preliminary matters which would not have required the actual opening statement and presentation of witnesses until perhaps the following Monday. Indeed, there were *in limine* motions to deal with as well as a scheduled conditional examination of a witness on the following day, Friday, April 12th."

Petitioner further explained that, in his view, *People* v. *Ferguson* (1990) 218 Cal.App.3d 1173 [267 Cal.Rptr. 528] was distinguishable. Petitioner also challenged the Commission's jurisdiction to investigate the matters set forth in the Commission's inquiry letter.[3]

### C. *The Commission's Notice*

By letter dated April 17, 1997, the Commission informed petitioner that it had ordered a preliminary investigation pursuant to Rules of the Commission on Judicial Performance, rules 109 and 111.[4] The Commission's notice explained that "[t]he nature of the possible charges" was set forth in the Commission's letter dated December 6, 1996, and that "[i]f true as described, your actions may constitute misconduct within the meaning of California Constitution, Article VI, section 18(d)." The Commission afforded petitioner "an opportunity to present in writing such matters as you may chose [*sic*]."

---

[3]The People appealed from petitioner's order dismissing the case, and also sought writ relief. The Court of Appeal summarily denied the writ, and the People abandoned the appeal, instead refiling the case in the trial court. The defendant subsequently was acquitted by a jury.

[4]Rule 109 of the Rules of the Commission on Judicial Performance provides that if a complaint against a judge is not obviously unfounded or frivolous, the Commission may make a staff inquiry to determine whether sufficient facts exist to warrant a preliminary investigation and, if so, make a preliminary investigation to determine whether formal proceedings should be instituted and a hearing held. Unless otherwise noted, subsequent references to rules are to the Rules of the Commission on Judicial Performance.

Rule 111(a) provides that "[i]f the Commission commences a preliminary investigation, the judge shall be notified of the investigation and the nature of the charge, and shall be afforded a reasonable opportunity in the course of the preliminary investigation to present such matters as the judge may choose."

Rule 111(c) provides that "[a]t any time after notice of a preliminary investigation and a reasonable opportunity to respond has been given to the judge, the commission may determine that the judge's conduct does not constitute a basis for further proceedings and may terminate the investigation by issuing a confidential advisory letter to the judge."

### D. *Petitioner's Supplemental Response*

By letter dated May 8, 1997, petitioner reiterated his belief that he had not violated any statute, court rule, or canon of judicial ethics in connection with his dismissal of People v. James. He asserted that he "made a proper legal ruling, the losing party made 'objections' to that ruling . . . , and the Court of Appeal considered and rejected those objections. The lack of success of the writ petition in People v. James demonstrates that the case cited as controlling by the Deputy District Attorney (*People* v. *Ferguson*) was not in fact on point." Petitioner's supplemental response opined that further inquiry by the Commission was unwarranted and that no basis existed to impose discipline.

### E. *The Commission's Advisory Letter*

On July 14, 1997, the Commission sent the following confidential advisory (or "stinger") letter to petitioner:

"The matter about which you and commission staff have corresponded was considered by the Commission on Judicial Performance at its July meeting. After reviewing all the information before it, including the letters of January 27 and May 8, 1997, submitted on your behalf by counsel, the commission concluded that further proceedings are not warranted and determined to close the matter with this severe advisory letter.

"In making this determination, the commission strongly disapproved of your handling of the felony child molestation case of *People* v. *James*. Your dismissal of the case on April 11, 1996, occurred under circumstances equivalent to those in the earlier case of *People* v. *Ferguson*, in which the Court of Appeal reversed your dismissal of the case in a published opinion in 1990. When a judge's order is reversed in a published decision, and the judge repeats the action, such conduct necessarily raises concerns about a reckless disregard of the law, diminishing public confidence in the judiciary in contravention of Canon 2A. When the conduct is repeated against the same party, concerns of bias or a lack of impartiality may also be raised. *See* Canon 3B(5). As respects your conduct in dismissing the *People* v. *James* case, the commission was also particularly disturbed that the *People* v. *Ferguson* decision was brought to your attention by counsel before you dismissed the case.

"Article VI, section 18.5 of the California Constitution and Commission Rule 102 set forth the provisions concerning confidentiality of advisory letters.

"Thank you for your cooperation. The matter is now closed."

## DISCUSSION

██ ██ Petitioner filed this original writ proceeding on October 3, 1997.[5] He contends: (1) the Commission lacked authority to issue an advisory letter; (2) even if the Commission was empowered to issue such a letter, the Commission's procedure in doing so violated his right to due process of law; (3) the Commission may not issue a stinger letter based upon a perceived legal error committed by a judge; and (4) in the present case, no sanctionable legal error was committed.

Having issued an alternative writ of mandate, we now address these issues in turn.[6]

### A. *Whether the Commission Has Authority to Issue an Advisory Letter*

██ The California Constitution provides the mechanism for the disciplining of judges (Cal. Const., art. VI, § 18; *Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1320 [240 Cal.Rptr. 859, 743 P.2d 919]) and establishes the Commission on Judicial Performance as the entity responsible for disciplining judges, subject to review by this court. (Cal. Const., art. VI, §§ 8, 18.) Article VI, section 18, subdivision (d), of the California Constitution, specifies that the disciplinary options available to the Commission include censure, removal, involuntary retirement, and public or private admonishment.[7]

---

[5]The correct means by which to obtain judicial review of an advisory letter is by a petition for writ of mandate. Because the instant proceeding is neither a "review of a determination by the commission to retire, remove, censure, admonish, or disqualify" a judge (Cal. Const., art. VI, § 18, subd. (d)), nor a legal proceeding requesting "injunctive relief or other provisional remedy" (Cal. Const., art. VI, § 18, subd. (g)), this court is not required to issue its decision within any specific time period.

[6]Our alternative writ of mandate set forth in pertinent part: "The petition for writ of mandate on file herein having been considered and good cause appearing for the issuance of this alternative writ of mandate, respondent hereby is commanded to withdraw its advisory letter issued to petitioner, dated July 14, 1997, or, in the alternative, to show cause before this court why the relief sought in the petition should not be granted on the following ground or grounds: (1) the Commission lacks authority to issue confidential letters, (2) if the Commission has such authority, its procedure for doing so is invalid, and (3) if the Commission has such authority, the facts of this case did not warrant issuance of such a letter."

[7]Article VI, section 18, subdivision (d), of the California Constitution, provides in pertinent part: "Except as provided in subdivision (f) [which applies to justices and former justices of the California Supreme Court], the Commission on Judicial Performance may (1) retire a judge for disability that seriously interferes with the performance of the judge's duties and is or is likely to become permanent, or (2) censure a judge or former judge or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current

Petitioner contends that because the constitutional provision cited above makes no reference to advisory letters, the Commission is without jurisdiction to issue them. He further contends that, even if the Commission considers such letters to be *"advisory"* or *"educational"* in nature, in fact they represent *disciplinary* action. The Commission disagrees with these contentions.

In addressing the parties' respective positions, we briefly trace the evolutionary development of the relevant rules and practices involved. In each year since its inception in 1961, the Commission confidentially and informally has cautioned against and disapproved of judicial misbehavior when the Commission deemed it appropriate to do so. (See generally, Com. Jud. Performance ann. reps. to Governor, 1983-1997.) The Commission traditionally has issued advisory letters to judges regarding matters that it determines do not warrant admonishment, censure, removal, or involuntary retirement, but which it considers too significant to dismiss without comment. (See Com. Jud. Performance, Rep. to Governor (1983) p. 6; see also Rothman, Cal. Judicial Conduct Handbook (1990) Private Admonitions by the Commission on Judicial Performance, pp. VII:1 to VII:27.)[8]

The Commission's long-standing practice of issuing advisory letters was formally acknowledged in 1988 when the Judicial Council—which at that time had rulemaking authority for the Commission under former article VI,

---

term or of the former judge's last term that constitutes willful misconduct in office, persistent failure or inability to perform the judge's duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute, or (3) publicly or privately admonish a judge or former judge found to have engaged in an improper action or dereliction of duty. . . ."

[8]Typically, the largest category of advisory letters implicate California Code of Judicial Ethics, canon 3B(4): "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom judges deal in an official capacity . . . ." Thus, most advisory letters involve judicial demeanor, including unnecessary harshness, sarcasm, impatience, name-calling, and a variety of other inappropriate conduct on the bench. (See, e.g., Com. Jud. Performance, 1990 Ann. Rep., p. 21; Com. Jud. Performance, 1989 Ann. Rep., p. 22; see also Com. Jud. Performance, 1996 Ann. Rep., p. 24: "An advisory letter may be issued when the impropriety is isolated or relatively minor, or when the impropriety is more serious but the judge has demonstrated an understanding of the problem and has taken steps to improve. An advisory letter is especially useful when there is an appearance of impropriety. An advisory letter might be appropriate when there is actionable misconduct offset by substantial mitigation.")

In recent years, the Commission has issued an average of approximately 37 advisory letters annually. (See Com. Jud. Performance, 1989-1997 ann. reps.)

section 18, subdivision (h), of the California Constitution—adopted California Rules of Court, rules 904.1 and 904.2(c), effective January 1, 1989.[9]

In discussing the proposed California Rules of Court, rules 904.1 and 904.2(c), the Judicial Council Advisory Committee on Judicial Performance Procedures recognized the salutary effect of advisory letters, observing that such communications do not constitute "formal" discipline.[10] The California Judges Association characterized advisory letters as "an informal quasi-discipline tool." (Cal. Judges Assn.: Procedures of Commission on Judicial

---

[9]California Rules of Court, former rule 904.1, provided: "At any time during the course of a staff inquiry, the commission may determine that a judge's conduct does not constitute a basis for further proceedings and may terminate the inquiry by issuing a confidential advisory letter to the judge. Before the commission issues an advisory letter, the judge shall be notified of the inquiry, the nature of the charge, and the name of the person making the verified statement or, if none, that the inquiry is on the commission's own motion. The judge shall be afforded a reasonable opportunity in the course of the inquiry to present such matters as the judge may choose. A reasonable time for a judge to respond to an inquiry letter shall be 20 days from the date the letter was mailed to the judge unless the time is extended for good cause shown.

"If the staff inquiry does not disclose sufficient cause to warrant issuance of a confidential advisory letter or further proceedings, the commission shall terminate the staff inquiry and notify the judge in writing." (Adopted eff. Jan. 1, 1989, and repealed eff. Dec. 1, 1996.)

California Rules of Court, former rule 904.2(c), provided: "At any time after notice of a preliminary investigation and a reasonable opportunity to respond has been given to the judge, the commission may determine that the judge's conduct does not constitute a basis for further proceedings and may terminate the investigation by issuing a confidential advisory letter to the judge." (Adopted eff. Jan. 1, 1989, and repealed eff. Dec. 1, 1996.)

[10]The Judicial Council Advisory Committee on Judicial Performance Procedures reported in pertinent part:

"The Commission on Judicial Performance uses an informal process of sending letters of caution, disapproval, and correction to judges whose conduct is questionable in some way or which might be considered 'borderline,' but which does not warrant formal discipline. This process is widely referred to as 'the stinger letter.' No specific authority for this procedure is contained in the rules governing commission procedures. The commission proposed that a rule be adopted which would authorize the commission to use this procedure. CJA [the California Judges Association] also supports adding specific authority for this procedure to the rules and clarifying the circumstances warranting its use.

"The committee found that use of an advisory letter procedure appears to be an effective educational tool for the commission and operates to benefit and assist the individual judge attempting in good faith to comply with all ethical duties. The committee further determined that since the letter merely provides advice and counseling, use of the procedure does not constitute a form of discipline. Legitimizing the procedure, the committee decided, need not involve a constitutional amendment and can properly be accomplished by rule.

"The advisory committee therefore recommends adoption of two provisions authorizing issuance of a confidential advisory letter at any time during the course of a staff inquiry or after commencement of a preliminary investigation. The proposed rule changes would require that notice to the judge and an opportunity to respond be afforded prior to issuance of the letter.

"These suggested changes are set forth in proposed rules 904.1 and 904.2(c) . . . . No adverse comments relating to these proposals were received." (Judicial Council of Cal., Rep.

Performance (July 24, 1987) p. 58.)[11] As noted above, the Commission similarly contends that advisory letters represent an action falling short of formal discipline; we observe, however, that the Commission has not been consistent in describing such letters as generally benign, educational advisories. (See Com. Jud. Performance, 1989 Ann. Rep., p. 22 ["In some cases, the commission will simply advise caution or express disapproval of the judge's conduct. *This milder form of discipline* is contained in letters of advice or disapproval called 'advisory letters' (Rule 904.1). The commission sometimes issues advisory letters *when the misconduct is clear* but the judge has demonstrated an understanding of the problem and has taken steps to improve. They are also used when the impropriety is isolated or relatively minor." (Italics added.)].) The circumstance that such letters may be considered by the Commission in subsequent proceedings further suggests that the letters have a potentially disciplinary *effect*. (See e.g., *Broadman* v. *Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1098-1099 [77 Cal.Rptr.2d 408, 959 P.2d 715] [upholding Commission's recommendation of public censure of judge who commented publicly on a pending case after

---

and Recommendation of Judicial Council Advisory Com. on Judicial Performance Procedures, Court Management Committee (Oct. 3, 1988) pp. 6-7.)

Although the cover sheet of the report herein cited is labeled "(Staff Draft)" and "Not for Release," the report is contained in a binder for the Court Management Committee's agenda for October 21, 1988, which is available to the public at the Administrative Office of the Courts. Further, the minutes of the Judicial Council's meeting of November 3, 1988, note that the council followed the Court Management Committee's recommendation that the proposed rules be adopted. (See Judicial Council of Cal., minutes of meeting (Nov. 3, 1988) pp. 14-15 [adopting rules 904.1 and 904.2]; Admin. Office of Courts, Press Release No. 84 (Nov. 17, 1988) p. 2 ["The Judicial Council adopted a rule which codifies an existing practice of the Commission on Judicial Performance of issuing a confidential advisory letter in an appropriate case after either a staff inquiry or a preliminary investigation. The advisory letter serves a warning or counseling function for judges whose conduct is not severe enough to warrant further action."].)

[11]The California Judges Association formerly promulgated the Code of Judicial Conduct, which, although not formally adopted by a governmental entity, served as a guide to judicial conduct and was relied upon by this court and the Commission on Judicial Performance in evaluating disciplinary charges against judicial officers. (See, e.g., *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 707, fn. 22 [122 Cal.Rptr. 778, 537 P.2d 898] ["We do not rely on the code in ascertaining violations thereof as grounds for disciplining petitioner; discipline is imposed pursuant to the constitutional provisions and rules in implementation thereof heretofore noted and considered. However, we acknowledge the applicability of the code to any conduct we as judges participate in after its effective date."].)

As part of its promulgation of the former Code of Judicial Conduct, the California Judges Association provided interpretive and explanatory materials to assist judges in understanding and complying with the disciplinary system. In addressing the matter of confidential advisory letters, the California Judges Association reported: "The stinger [letter] is used when a judge's conduct is deemed to be marginal: not worthy of *formal discipline*, but not to be condoned. The stinger is supposed to be a form of constructive criticism or advice *as well as a harbinger of future bad tidings if the advice is not followed*." (Cal. Judges Assn.: Procedures of Commission on Judicial Performance, *supra*, at p. 58, italics added.)

having received the Commission's advisory letter admonishing him for similar conduct].)

The electorate's passage of Proposition 190 in November 1994 directed the transfer of authority for rulemaking from the Judicial Council to the Commission. After Proposition 190 took effect in March 1995, the Commission invited public comment regarding proposed revisions to the rules, ultimately replacing California Rules of Court, rules 904.1 and 904.2(c), with virtually identical provisions, redesignated as Rules of the Commission on Judicial Performance, rules 110 and 111(c), effective December 1, 1996.[12]

In addition to the transfer of rulemaking authority noted above, the electorate's passage of Proposition 190 amended the California Constitution to include article VI, section 18.5, which provides that "the text of any private admonishment, *advisory letter, or other disciplinary action*" shall be provided by the Commission upon request to public officials who may be considering a judicial appointment of the judge, as well as to the Commission on Judicial Appointments with respect to an applicant for a judicial appointment. (Cal. Const., art. VI, § 18.5, subds. (a), (b), (c), italics added.)[13] Thus, although as petitioner observes, article VI, section 18,

---

[12]Rule 110 provides: "(a) (Notice prior to issuance of advisory letter) If the commission makes a staff inquiry, the judge shall be notified of the inquiry and the nature of the charge, before the commission issues an advisory letter. The respondent judge so notified shall be afforded a reasonable opportunity in the course of the inquiry to present such matters as the judge may choose. A reasonable time for a judge to respond to an inquiry letter shall be 20 days from the date the letter was mailed to the judge unless the time is extended pursuant to rule 108.

"(b) (Termination of staff inquiry) If the staff inquiry does not disclose sufficient cause to warrant issuance of a confidential advisory letter or further proceedings, the commission shall terminate the staff inquiry and notify the judge in writing of such action if the judge was notified of the staff inquiry pursuant to subdivision (a).

"(c) (Advisory letter) At any time after notice of a staff inquiry and a reasonable opportunity to respond has been given to the judge, the commission may determine that the judge's conduct does not constitute a basis for further proceedings and issue a confidential advisory letter to the judge."

As noted previously, rule 111(c) similarly provides: "(Advisory letter) At any time after notice of a preliminary investigation and a reasonable opportunity to respond has been given to the judge, the commission may determine that the judge's conduct does not constitute a basis for further proceedings and may terminate the investigation by issuing a confidential advisory letter to the judge."

[13]Article VI, section 18.5, subdivisions (a), (b), and (c), of the California Constitution provide:

"(a) Upon request, the Commission on Judicial Performance shall provide to the Governor of any State of the Union the text of any private admonishment, advisory letter, or other

subdivision (d), of the California Constitution, does not explicitly identify advisory letters as a form of discipline or admonishment available to the Commission, article VI, section 18.5, explicitly includes the issuance of such letters within the range of permissible alternatives. This latter constitutional provision codifies the Commission's long-standing practice of issuing advisory letters, characterizes such letters as "disciplinary action," recognizes the Commission's authority to issue such letters, and permits their release in certain circumstances. The section thus removes these letters from the realm of permanently private communications between the Commission and a judge, and makes clear that they may be transmitted to other, designated individuals. In the present case, the potentially detrimental impact of the Commission's advisory letter was plain, in view of the Commission's own characterization that its missive was a "severe advisory letter," used to "strongly disapprove" of petitioner's actions.[14]

In view of the foregoing, we reject petitioner's position that the Commission acted in excess of its jurisdiction when it issued the advisory letter challenged here. We find persuasive, however, his argument that advisory letters fairly may be characterized as "disciplinary" in nature, because they may be considered by the Commission in subsequent proceedings and because, in the wake of the new constitutional provision, the confidentiality of the letters no longer is assured.[15]

---

disciplinary action together with any information that the Commission on Judicial Performance deems necessary to a full understanding of the commission's action, with respect to any applicant whom the Governor of any State of the Union indicates is under consideration for any judicial appointment.

"(b) Upon request, the Commission on Judicial Performance shall provide the President of the United States the text of any private admonishment, advisory letter, or other disciplinary action together with any information that the Commission on Judicial Performance deems necessary to a full understanding of the commission's action, with respect to any applicant whom the President indicates is under consideration for any federal judicial appointment.

"(c) Upon request, the Commission on Judicial Performance shall provide the Commission on Judicial Appointments the text of any private admonishment, advisory letter, or other disciplinary action together with any information that the Commission on Judicial Performance deems necessary to a full understanding of the commission action, with respect to any applicant whom the Commission on Judicial Appointments indicates is under consideration for any judicial appointment."

[14]An advisory letter issued by the Commission may be characterized as being analogous to a written reprimand given by an employer to an employee; such reprimands typically are considered part of a system of progressive *discipline*. (See, e.g., *Kazensky* v. *City of Merced* (1998) 65 Cal.App.4th 44, 73 [76 Cal.Rptr.2d 356]; *Fontana Teachers Assn.* v. *Fontana Unified School Dist.* (1988) 201 Cal.App.3d 1517, 1522 [247 Cal.Rptr. 761].)

[15]As noted, the Commission issued its advisory letter to petitioner on July 14, 1997. In view of our holding that article VI, section 18.5, of the California Constitution authorizes the Commission to issue advisory letters, we need not and do not reach petitioner's contention

B. *Whether the Commission's Procedure in Issuing an Advisory Letter Violated Petitioner's Right to Due Process of Law*

 Having concluded that the Commission's issuance of its advisory letter amounted to a disciplinary response within the Commission's jurisdiction, we turn now to petitioner's contention that the Commission's procedures in issuing the letter violated his right to due process of law. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 7, subd. (a); *Allgeyer* v. *Louisiana* (1897) 165 U.S. 578, 589-590 [17 S.Ct. 427, 431, 41 L.Ed. 832] [the " 'right to follow any of the common occupations' " is " 'a large ingredient in the civil liberty of the citizen' "].)

Petitioner contends that "not even the minimal requirements of due process of law are ever satisfied before an investigated judge is issued a stinger letter . . . . There is no hearing at all. There is no right to review the evidence the Commission has reviewed. There is no right to confront adverse witnesses or evidence. There is no established right of review by the judicial branch of State government." Petitioner adds that, in view of article VI, section 18.5, of the California Constitution (authorizing the release of advisory letters to any Governor, the President, and the Commission on Judicial Appointments), the issuance of an advisory letter "is potentially devastating to a judge's chances of future appointments and advancement in the judge's profession." He also notes that the Commission has, in disciplinary proceedings involving other jurists, introduced advisory letters issued to the judge under investigation, "in order to show aggravation, or to show a common pattern of improper behavior, or to show a failure of the judge to heed the Commission's advice." For these reasons, petitioner urges this court to invalidate procedures followed by the Commission in issuing advisory letters.

We decline to do so. "Under the California Constitution, the extent to which procedural due process is available depends on a weighing of private and governmental interests involved. The required procedural safeguards are those that will, without unduly burdening the government, maximize the accuracy of the resulting decision and respect the dignity of the individual subjected to the decisionmaking process. Specifically, determination of the dictates of due process generally requires consideration of four factors: the private interest that will be affected by the individual action; the risk of an erroneous deprivation of this interest through the procedures used and the probable value, if any, of additional or substitute safeguards; the

---

that similar letters issued by the Commission prior to the December 1, 1996, effective date of section 18.5 "are illegal and must be purged from [the Commission's] files."

dignitary interest of informing individuals of the nature, grounds and conse-quences of the action and of enabling them to present their side of the story before a responsible governmental official; and the government interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. [Citations.]" ▮▮ (*Rodriguez* v. *Department of Real Estate* (1996) 51 Cal.App.4th 1289, 1297 [59 Cal.Rptr.2d 652], fn. omitted; see also *People* v. *Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694] [due process is a flexible concept]; *Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 565 [216 Cal.Rptr. 367, 702 P.2d 525] [not every situation requires a formal hearing with full rights of confrontation and cross-exami-nation].)[16]

▮▮ In the face of the well-established case law underscoring the elas-ticity inherent in due process principles, petitioner fails to provide this court with any authority to support his contention that the issuance of an advisory letter requires a level of due process greater than that provided in Rules of the Commission on Judicial Performance, rule 110. As specified in rule 110 (and its predecessor, California Rules of Court, rule 904.1), the prerequisites for issuance of an advisory letter are notice to the judge of "the inquiry and the nature of the charge," and a "reasonable opportunity to respond."

---

[16]Under federal due process analysis, the aggrieved party must establish a protected property interest. (*Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484].) Although it is true that the Fourteenth Amendment "protects the pursuit of one's profession from abridgment by arbitrary state action" (*Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 169 [65 Cal.Rptr. 297, 436 P.2d 297]), "due process of law" is not a fixed theory, embodying a standardized set of procedures or a trial-like hearing in each instance. To the contrary, as noted by the United States Supreme Court in *Hannah* v. *Larche* (1960) 363 U.S. 420 [80 S.Ct. 1502, 4 L.Ed.2d 1307], due process is an elusive concept: "Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, *as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.* Therefore, as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all consider-ations which must be taken into account." (*Id.* at p. 442 [80 S.Ct. at pp. 1514-1515], italics added; see also *Mathews* v. *Eldridge* (1976) 424 U.S. 319, 334 [96 S.Ct. 893, 902, 47 L.Ed.2d 18] [same]; *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 895 [81 S.Ct. 1743, 1748-1749, 6 L.Ed.2d 1230] ["The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. . . . [¶] . . . [C]onsideration of what procedures due process may require under any given set of circum-stances must begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action."].)

The Commission's inquiry letter, dated December 6, 1996, provided petitioner with notice of the inquiry and the nature of the charge, and gave him an opportunity to respond. Petitioner presented his case in opposition (by letter dated January 27, 1997), defending his decision to grant the defendant's motion to dismiss People v. James, in substantial part because the prosecution had failed to comply with the statutory requirements applicable to a motion to continue the trial and thereafter had refused to proceed. The Commission subsequently informed petitioner that it had ordered a preliminary investigation, explaining that "[t]he nature of the possible charges" was set forth in the Commission's letter dated December 6, 1996. The reply also afforded petitioner a further opportunity to explain his handling of People v. James. Petitioner thereafter filed a supplemental response, again defending his conduct.

As noted previously, petitioner contends that, in addition to the procedures outlined in the preceding paragraph, he was entitled to a hearing, the right to review the evidence considered by the Commission, the right to confront adverse witnesses or evidence, and the right to judicial review—in other words, the functional equivalent of a trial. And, at oral argument, *the Commission* similarly contended that if advisory letters were deemed to be "disciplinary" in nature, then petitioner would be entitled to a "full adversary hearing." We disagree. "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' [Citation.] All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard' [citation], to insure that they are given a meaningful opportunity to present their case." (*Mathews* v. *Eldridge, supra*, 424 U.S. 319, 348-349 [96 S.Ct. 893, 909].) Thus, procedural due process does not require a trial-type hearing in every instance. (*Anderson Nat. Bank* v. *Luckett* (1944) 321 U.S. 233 [64 S.Ct. 599, 88 L.Ed. 692, 151 A.L.R. 824].)

The procedural protections petitioner contends were improperly withheld from him are of the type more appropriately required whenever action by the state significantly impairs an individual's freedom to pursue a private occupation. (*Willner* v. *Committee on Character* (1963) 373 U.S. 96, 103-106 [83 S.Ct. 1175, 1180-1182, 10 L.Ed.2d 224, 2 A.L.R.3d 1254]; accord, *Endler* v. *Schutzbank, supra*, 68 Cal.2d 162, 172-178; see also *Rodriguez* v. *Department of Real Estate, supra*, 51 Cal.App.4th 1289, 1296-1300 [notice and opportunity to provide *written* argument prior to *suspension* of broker's license held to comport with principles of due process].) In the present case, however, no such significant impairment was at risk at this early stage in the

disciplinary process.[17] Advisory letters may range from a mild suggestion to a severe rebuke; although they may reduce a judge's chance of being elevated to a higher court (or appointed to some other office), such letters do not inexorably subject a judge to public opprobrium or other inevitable consequences that might impair the individual's freedom to pursue his or her chosen occupation.

The nature of the Commission's investigation was, at its core, a *fact-finding mission* focused upon petitioner's handling of the case of People v. James. The Commission's inquiry lent itself well to proof though documentary forms of evidence including hearing transcripts and the parties' briefing. In view of these factors, we are satisfied that the Commission's procedures were adequate. They provided petitioner with sufficient notice of the Commission's inquiry, specifically identified the focus of, and evidentiary basis for, the Commission's investigation, and granted petitioner sufficient opportunities to address the Commission's concerns and defend himself against the allegation that he had acted improperly. (See generally, *Saleeby* v. *State Bar, supra*, 39 Cal.3d 547, 565 [in an action seeking a disbursement by the State Bar from the Client Security Fund, this court held that "[a] formal hearing, with full rights of confrontation and cross-examination is not necessarily required"]; see also *Shacket* v. *Osteopathic Medical Board* (1996) 51 Cal.App.4th 223, 231, fn. 4 [58 Cal.Rptr.2d 715] [medical peer review board was "not required to hold a formal hearing before filing and disseminating" a report involving suspension of physician].) The Commission thus fulfilled its obligation to inform petitioner of all material facts behind the allegations.

We are unpersuaded that the additional safeguards urged by petitioner are required. He fails to demonstrate that his interest in avoiding this relatively mild form of discipline is sufficiently significant to justify the added time and expense of the safeguards he proposes. Nor does he show that the consequences of an advisory letter are so severe as to invoke the need for a higher level of process. Similarly, he does not address the possibility that the safeguards he seeks could have a detrimental impact upon the Commission's effectiveness by requiring a disproportionate use of the Commission's resources. (See, e.g., *Mathews* v. *Eldridge, supra*, 424 U.S. 319, 348 [96 S.Ct.

---

[17]Had the preliminary investigation resulted in a determination by the Commission that a private or public admonishment was appropriate, petitioner would have been entitled to request a hearing and contest the Commission's intended action. (Rules 113-116, 118.) If, after the preliminary investigation, the Commission had concluded that formal proceedings should be instituted (rule 118), petitioner would have been afforded further opportunity to respond in writing (rule 119), as well as a hearing before special masters or the Commission (rules 121, 123-125). The Commission's rules provide the judge with procedural rights in such formal proceedings (rule 126).

893, 909] ["[T]he Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost."]; *Rodriguez* v. *Department of Real Estate, supra,* 51 Cal.App.4th 1289, 1299 [the full range of procedural due process rights sought, including the right to a hearing and to confront and cross-examine witnesses, "would impose great fiscal and administrative burdens on the process"].)[18]

The contrast between petitioner's position here, and that historically taken by the California Judges Association and the Judicial Council, also is instructive. The two organizations *endorsed* the Commission's practice of issuing advisory letters, in part because such letters provided an *informal, less severe alternative* to more formal discipline. Among the panoply of disciplinary measures available to the Commission, an advisory letter comprises a mild response. In view of these considerations, the additional procedural protections that petitioner urges appear paradoxical and unduly onerous.[19]

Article VI, section 18, subdivision (j), of the California Constitution provides that when the Commission institutes formal proceedings, the notice of charges, the answer, and all subsequent papers and proceedings shall be open to the public. The adoption of petitioner's position that more formal proceedings must be held before an advisory letter may be issued also might invoke the constitutional requirement that such proceedings be made public, thereby eliminating the confidentiality and informality of this form of discipline that makes it less onerous and detrimental to the judge. In short, granting the process requested by petitioner might well end up eliminating the benefits of the form of discipline itself.

Although, pursuant to article VI, section 18.5, of the California Constitution, information regarding an advisory letter may be requested by the President, a Governor, or the Commission on Judicial Appointments, and thus the confidentiality of the letter no longer is limited to the Commission and the judge (see Cal. Const., art. VI, § 18.5, subds. (a), (b), (c)), we also observe that the judge at that point is provided with information given to the

---

[18]We also observe that if a full trial-type hearing were held whenever the Commission contemplated the issuance of an advisory letter, the negative impact upon the administration of justice likely would be significant, because such hearings would involve diverting the affected jurists from their courtrooms.

[19]We note that the availability of writ review in this court provides an additional due process guarantee for the recipient of an advisory letter.

requesting party (*id.*, subd. (e)), and thus may fully respond, rebut, or otherwise explain the subject matter of the letter to the party that requested it. Moreover, the judge may describe the events that transpired in the period since the letter was issued. This additional opportunity to respond, although less preferable from a judge's standpoint than nondisclosure of the letter, provides a meaningful method to mitigate the potentially adverse impact created by such disclosure. Because the Commission's issuance of an advisory letter has only the potential, tangential effect of inflicting harm upon a judge's career, the implementation of additional procedural safeguards is unnecessary.

Balancing petitioner's private interest in maintaining a judicial career free of the infliction of disciplinary measures, and the Commission's interest in the effective and efficient safeguarding of the public from aberrant action by judicial officers, we are satisfied that due process of law does not require the additional protections urged by petitioner as prerequisites to the Commission's issuance of an advisory letter. The Commission's procedures sufficiently protect a judge's interests from the unreasonable issuance of such a letter, and thus are adequate to satisfy the requirements of due process of law.

### C. *Whether the Commission May Issue an Advisory Letter Based upon a Perceived Legal Error Committed by a Judge*

In considering the scope of conduct for which the Commission may impose discipline, we are guided by the California Code of Judicial Ethics. (See Cal. Const., art. VI, § 18, subd. (m) [imposing upon this court the responsibility of making "rules for the conduct of judges, both on and off the bench, and for judicial candidates in the conduct of their campaigns"].) Canon 1 of the Code of Judicial Ethics provides: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and should personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code should be construed and applied to further that objective. *A judicial decision or administrative act later determined to be incorrect legally is not itself a violation of this Code.*" (Italics added.)

 In view of the foregoing provision, petitioner contends that the advisory letter issued to him is invalid, because at most the letter addresses a *legal error* committed by a judge—not *judicial misconduct*. In further support of this contention, he cites a number of judicial decisions rendered

by this court, and by our sister state courts, in which legal error, alone, was deemed insufficient to constitute sanctionable conduct. (See *Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 63 [207 Cal.Rptr. 171, 688 P.2d 551] [upholding the commission's recommendation of public censure where judge's culpability "transcend[ed] mere legal error"]; *Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 646, fn. 13 [175 Cal.Rptr. 420, 630 P.2d 954] [judge's ruling "had at least enough merit" not to constitute misconduct]; see also *Matter of Seaman* (1993) 133 N.J. 67 [627 A.2d 106, 122]; *Matter of Barrett* (Del. Ct. on Judiciary 1991) 593 A.2d 529, 533; *Matter of Benoit* (Me. 1985) 487 A.2d 1158, 1162-1163; *West Va. Jud. Inquiry Com'n* v. *Dostert* (1980) 165 W.Va. 233 [271 S.E.2d 427, 433-434]; *People* ex rel. *Harrod* v. *Illinois Cts. Com.* (1977) 69 Ill.2d 445 [14 Ill.Dec. 248, 372 N.E.2d 53, 65]; *In re Mattera* (1961) 34 N.J. 259 [168 A.2d 38, 44].) Petitioner asserts that a legal ruling that has any "intellectual merit" cannot support a finding of judicial misconduct; to hold otherwise would compromise the independence of the judiciary. (See Overton, *Grounds for Judicial Discipline in the Context of Judicial Disciplinary Commissions* (1977) 54 Chi.-Kent L.Rev. 59, 65-66; see also Shaman et al., Judicial Conduct and Ethics (2d ed. 1995) Use of Power, § 2.02, p. 32.)[20]

The Commission concedes that a judge's legal error "is not ordinarily misconduct." The Commission contends, however, that an act that is legally erroneous nevertheless can constitute misconduct if it involves "bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law or any purpose other than the faithful discharge of judicial duty." (See *In re Whitney* (1996) 14 Cal.4th 1, 2-3 [56 Cal.Rptr.2d 705, 922 P.2d 868] [failure to follow the law regarding arraignment procedures]; *McCullough* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 186, 192 [260 Cal.Rptr. 557, 776 P.2d 259] [willful misconduct to direct guilty verdict in criminal action and thereby deprive the defendant of fundamental right to jury trial]; *Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 374-375 [188 Cal.Rptr. 880, 657 P.2d 372] [willful misconduct to visit jury room during deliberations]; *Gubler* v. *Commission on*

---

[20]"Imposing discipline upon a judge for an incorrect legal ruling is an extremely sensitive issue because of the potential impact on judicial independence. The preservation of an independent judiciary requires that judges not be exposed to personal discipline on the basis of case outcomes or particular rulings, other than in extreme or compelling circumstances. An independent judge is one who is able to rule as he or she determines appropriate, without fear of jeopardy or sanction. So long as the rulings are made in good faith, and in an effort to follow the law as the judge understands it, the usual safeguard against error or overreaching lies in the adversary system and appellate review. As the courts have often said, the disciplinary process should not be used as a substitute for appeal. Due to the possible threat to judicial independence, it has been suggested that legal error should be dealt with only in the appellate process and never should be considered judicial misconduct." (Shaman et al., Judicial Conduct and Ethics, *supra*, Use of Power, § 2.02, p. 32, fn. omitted.)

*Judicial Performance, supra,* 37 Cal.3d 27, 47-48, 55-59 [improper collection practices involving attorney fees, improper gun sale]; *Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826, 838-863 [264 Cal.Rptr. 100, 782 P.2d 239, 89 A.L.R.4th 235] [willful and prejudicial misconduct for failing to protect the rights of defendants, and abuses of power involving contempt procedure, orders to show cause, and bench warrants]; *Cannon* v. *Commission on Judicial Qualifications, supra,* 14 Cal.3d 678, 693-694 [failure to follow the law regarding contempt procedures].)

In response to petitioner's position that a judge's legal ruling cannot support a finding of judicial misconduct if the ruling has any intellectual merit, the Commission contends that petitioner overstates his case. The Commission argues that the decisions cited by petitioner stand for the proposition that the proper analysis focuses on the *additional circumstances that surround the ruling* in question. (See *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 646-648 [although one of the judge's rulings "had at least enough merit" not to constitute misconduct, *other* legal errors *were* misconduct]; *Matter of Seaman, supra,* 627 A.2d 106, 122 [although "mere error[]" was not sanctionable, charges against judge did not involve legal error, but sexual harassment]; *Matter of Barrett, supra,* 593 A.2d 529, 533 [charges against judge did not involve legal error, which generally is not sanctionable, but matters such as tardiness and political misconduct]; *Matter of Benoit, supra,* 487 A.2d 1158, 1162-1167 [in imprisoning defendants charged only with a civil infraction, judge's legal error constituted misconduct]; *West Va. Jud. Inquiry Com'n* v. *Dostert, supra,* 271 S.E.2d 427, 434 [judge's use of invalid procedure was not misconduct "[a]bsent proof of improper motive"]; *People* ex rel. *Harrod* v. *Illinois Cts. Com., supra,* 372 N.E.2d 53, 65 [although "mere errors" are not sanctionable, "a judge who repeatedly imposes punishment not provided for by law is subject to discipline"]; *In re Mattera, supra,* 168 A.2d 38, 47 [judge's noncompliance with procedural rules was not misconduct absent "improper motive"].)

Petitioner contends that a prohibition against "legal error investigation" is necessary in order to avoid abuse of the Commission's powers by persons politically or philosophically opposed to a particular jurist. Although we believe that the Commission properly should defer to a Court of Appeal's determination whether legal error in fact has occurred, we agree with the Commission's position that petitioner's proposed remedy is overbroad. A judge may, through repeated legal error, commit acts that would lead to violations of the judicial canons. For example, canon 2A of the California

Code of Judicial Ethics declares that "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." A judge who repeatedly dismisses certain kinds of claims might be subject to discipline if the dismissals are shown to be not only legally erroneous, but also based upon bias, prejudice, or some other improper purpose.

Instead, we agree with the Commission that legal error does not *preclude* a finding of misconduct, and that the Commission properly may consider surrounding factors in ascertaining whether discipline may be in order. Nevertheless, a judge must be free not only to make the correct ruling for the proper reasons, but also to make an incorrect ruling, believing it to be correct.[21] The determination whether a legal error provides the basis for discipline thus requires an inquiry into additional factors that demonstrate more than legal error, alone.

In summary, a judge who commits legal error which, *in addition*, clearly and convincingly reflects bad faith (*Broadman v. Commission on Judicial Performance, supra*, 18 Cal.4th 1079, 1091-1092), bias (*Kennick v. Commission on Judicial Performance* (1990) 50 Cal.3d 297, 327-331 [267 Cal.Rptr. 293, 787 P.2d 591, 87 A.L.R.4th 679]), abuse of authority (*Spruance v. Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 786-795 [119 Cal.Rptr. 841, 532 P.2d 1209]), disregard for fundamental rights (*Kloepfer v. Commission on Judicial Performance, supra*, 49 Cal.3d 826, 849-854), intentional disregard of the law (*Cannon v. Commission on Judicial Qualifications, supra*, 14 Cal.3d 678, 695-698), or any purpose other than the faithful discharge of judicial duty (*Ryan v. Commission on Judicial Performance* (1988) 45 Cal.3d 518, 545-546 [247 Cal.Rptr. 378, 754 P.2d 724, 76 A.L.R.4th 951]), is subject to investigation. (See generally, Shaman et al., Judicial Conduct and Ethics, *supra*, § 2.02, pp. 32-37.) Mere legal error, without more, however, is insufficient to support a finding that a judge has violated the Code of Judicial Ethics and thus should be disciplined.

D. *Whether Petitioner Should Be Sanctioned for Dismissing a Criminal Case After the People Indicated They Were Not Ready to Proceed*

We turn now to the facts of this case. As noted, the Commission's advisory letter informed petitioner that the Commission "strongly disapproved" of his handling of the proceedings in People v. James: "Your

---

[21](See Greenhouse, *Judges Seek Aid in Effort to Remain Independent*, N.Y. Times (Dec. 10, 1998) p. A20, quoting Hon. Adolpho A. Birch, former Chief Justice of the Tennessee Supreme Court: " 'Judicial independence is the judge's right to do the right thing or, believing it to be the right thing, to do the wrong thing.' ")

dismissal of the case . . . occurred under circumstances equivalent to those in the earlier case of *People* v. *Ferguson,* in which the Court of Appeal reversed your dismissal of the case in a published opinion in 1990. . . . As respects your conduct in dismissing the *People* v. *James* case, the commission was also particularly disturbed that the *People* v. *Ferguson* decision was brought to your attention by counsel before you dismissed the case."

Petitioner contends that in issuing its advisory letter, the Commission erroneously relied upon purported similarities between James and *Ferguson* in reaching the conclusion that petitioner improperly had handled the motion to dismiss that had been made in James. According to petitioner, if one were to "take away the Commission's determination that James cannot be legally distinguished from *Ferguson,* [then] there is no basis for the conclusion that [petitioner] engaged in a reckless disregard for the law." More specifically, petitioner argues that *Ferguson* "involved different circumstances and is distinguishable" from James on three distinct grounds: (1) the issue presented in *Ferguson* was whether the trial court had *abused its discretion* in granting the defendant's motion to dismiss, in contrast to James, where the trial court believed the denial of the oral motion for continuance was *mandatory;* (2) the facts of the two cases are inapposite—in *Ferguson,* trial counsel was temporarily unavailable, but in James, trial counsel was available but unprepared and unwilling to proceed; and (3) in *Ferguson,* no policy objective was served by the dismissal, but in James the interests of the defendant, witnesses, and justice in general were advanced by the trial court's insistence that proper notice be given.[22]

We need not enter the debate whether *Ferguson* and James were distinguishable, nor need we even decide whether petitioner committed "error" in dismissing the James matter. As noted, the critical inquiry is whether petitioner's action clearly and convincingly reflected bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty.

In the present case, we conclude that the evidence does not support such a determination. After *properly* denying an inadequate motion to continue (one that could have led to the imposition of sanctions under section 1050.5), petitioner was confronted with a prosecutor who stated that the People *unequivocally refused to proceed.* Not unreasonably, petitioner viewed the

---

[22]Petitioner also contends that in denying the writ relief sought by the People in James, the Court of Appeal impliedly rejected the Commission's position that *Ferguson* mandated a result different from that reached by the trial court in James. In view of our analysis and the conclusion we reach in the present opinion, we need not and do not address this contention.

prosecutor's challenge as an intolerable affront to the authority of the trial court, one that could have supported imposition of additional sanctions under the court's contempt power. (§ 166.) Our review of the proceedings as a whole suggests that petitioner in fact demonstrated extraordinary patience in dealing with an unprepared and unyielding prosecution. Viewed against the backdrop of the prosecution's recalcitrance to proceed, petitioner's order dismissing the case, even if legally incorrect, fails to "raise concerns" regarding "a reckless disregard of the law, . . . bias, or a lack of impartiality," as suggested by the Commission in its advisory letter. To the contrary, we find no evidence that petitioner's order dismissing the James case was motivated by bad faith, bias, abuse of authority, disregard for fundamental rights, intentional (or "reckless") disregard of the law, or any purpose other than the faithful discharge of judicial duty. Accordingly, we reject the Commission's position that petitioner's dismissal of the James case was sanctionable.

DISPOSITION

The petition for writ of mandate, seeking the withdrawal of the Commission's advisory letter, dated July 14, 1997, is granted. This court's alternative writ of mandate, filed December 31, 1997, is discharged. Each side shall bear its own costs incurred in this action.

**WERDEGAR, J.,** Concurring.—Although I agree with the result and with much of the reasoning in the majority opinion, I would take a somewhat different approach to the question of discipline for legal error. The question raised by this case, in my view, is not whether a judge's legal error is itself subject to investigation or discipline by the Commission on Judicial Performance (Commission)—even the Commission concedes it is not, and canon 1 of the California Code of Judicial Ethics so provides. The question, rather, is whether a legal error of the type asserted in the complaint against petitioner has such a tendency to reveal underlying misconduct as to justify investigation and discipline by the Commission. I would answer that question in the negative: Because the judge's position, as revealed in his initial response to the Commission's inquiry, had reasonably arguable merit, and because the Commission had no extrinsic evidence of bad faith, bias, abuse of authority, intentional disregard of the law, or any improper purpose, the Commission should have ended its investigation at the time of that response without any discipline.

The majority opinion (*ante*, at p. 397) rejects petitioner's "intellectual merit" argument, although we have previously adopted a similar threshold

standard. (See *Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 647, fn. 13 [175 Cal.Rptr. 420, 630 P.2d 954] [observing that, correct or not, one judge's ruling "had at least enough merit" not to constitute misconduct]; *Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 47-48 [207 Cal.Rptr. 171, 688 P.2d 551] [stating, with a citation to *Wenger* v. *Commission on Judicial Performance, supra,* that "a judge should not be disciplined for mere erroneous determination of legal issues . . . that are subject to reasonable differences of opinion"].) The majority, however, in order to explain why the rulings at issue here did not constitute misconduct, is nevertheless compelled to observe that the prosecutor's continuance was "*properly*" denied, that petitioner's view of the matter was "[n]ot unreasonabl[e]," and that petitioner demonstrated "extraordinary patience" (maj. opn., *ante,* at pp. 401-402, italics in original), all of which suggest the arguable correctness of petitioner's rulings is what precludes discipline. Rather than reject petitioner's position, then, I would accept it, at least in part: When, as here, the Commission has no extrinsic evidence of bad faith or improper motive—no evidence, that is, apart from the nature of the ruling itself—the Commission generally should not pursue an investigation into, or impose discipline for, a legal ruling that has reasonably arguable merit. In such circumstances, the principle of judicial independence requires that the determination whether the ruling was correct or not be left to a reviewing court.

In its letter of inquiry to petitioner, the Commission observed that petitioner had adhered to his dismissal ruling even after the deputy district attorney had drawn his attention to *People* v. *Ferguson* (1990) 218 Cal.App.3d 1173 [267 Cal.Rptr. 528] (*Ferguson*), in which the Court of Appeal reversed a dismissal under assertedly similar circumstances. I agree with the implication that, in some circumstances, a judge's ruling made in the face of directly contrary binding authority cited to him or her might be evidence of intentional disregard for the law. This was not such a case, however, because *Ferguson* was not so squarely on point as to absolutely preclude a different ruling in the James case. The Commission should have realized this, at the latest, when it received petitioner's responsive letter, which pointed out three arguably pertinent distinctions between *Ferguson* and James.[1] In the same letter, petitioner informed the Commission that the Court of Appeal had, despite its own *Ferguson* precedent, summarily denied

---

[1]Petitioner noted that *Ferguson* did not involve the mandatory denial of an improper oral motion for continuance (Pen. Code, § 1050, subd. (d)); that in *Ferguson* the assigned deputy district attorney was temporarily unavailable, while in James a deputy had been assigned who was available but unprepared to try the case; and that in *Ferguson* the People did not refuse to proceed and could have begun trial as soon as the same afternoon, while in James the chief deputy flatly refused to proceed without a continuance of several days. In addition, petitioner

the People's petition for a writ of mandate in James, an act suggesting the reviewing court did not consider *Ferguson* completely dispositive.

At this point, if not before, the Commission should have realized that this was a garden-variety legal dispute, in which a litigant complaining of an adverse ruling can (and did) seek review from a higher court. That the ruling complained of *appeared* contrary to a published decision should not, in itself, have concerned the Commission, especially when petitioner provided arguable grounds for distinguishing the precedent.[2] Disputes over whether a prior decision is distinguishable, or whether a particular statute applies, are as common as air in litigation and (to mix metaphors) are typical grist for the appellate mill. In the absence of any evidence of improper motive, such a dispute should not also become the focus of a disciplinary proceeding. Because, in this case, the judicial ruling complained of had at least arguable merit and the Commission cited no extrinsic evidence of improper purpose, the Commission was simply wrong to conclude, as it did in the advisory letter, that petitioner's order of dismissal after *Ferguson* was brought to his attention, "raises concerns about a reckless disregard of the law, . . . bias or a lack of impartiality . . . ."

Although the majority reaches the same ultimate conclusion as I, it unfortunately fails to address the hard question of when, if ever, the erroneous nature of a ruling might itself be evidence, sufficient for investigation or discipline, of a judge's improper disregard for the law. Without attempting to describe all the circumstances under which legal error does and does not demonstrate misconduct, I would hold that, at a minimum, the ruling must lack all reasonably arguable merit.[3]

For these reasons, I concur in granting the petition.

---

argued the dismissal in James served certain policy objectives the *Ferguson* court found lacking in that case.

[2]Research into the subject, moreover, would have revealed precedent arguably *supporting* the dismissal order. (See, e.g., *People* v. *Torres* (1984) 159 Cal.App.3d Supp. 8, 13 [206 Cal.Rptr. 537] [dismissal proper when prosecutor demands continuance and refuses to proceed without one in order to control timing of trials].)

[3]To repeat, I speak here only of the case, such as this one, in which the Commission can cite no extrinsic evidence of improper motive or other misconduct.